1997 SD 71

**H.A. POINDEXTER, Jerry Poindexter and Jackie Poindexter,**
Appellants,

v.

**HAND COUNTY BOARD OF EQUALIZATION,**
Appellee.

No. 19862.

Supreme Court of South Dakota.

Considered on Briefs May 1, 1997.

Decided June 18, 1997.

---

---

William H. Golden of Heidepriem, Widmayer, Zell & Jones, Miller, for appellants.

Patricia A. Leary Carlson, Hand County Ltd. Deputy State's Attorney, Miller, for appellee.

SABERS, Justice.

[¶ 1] Taxpayer appeals assessment of agricultural land. We affirm.

## FACTS

[¶ 2] In 1994, the Hand County Director of Equalization assessed Poindexter's agricultural land, primarily using a "crop rating." The land is located in Miller and Midland Townships in Hand County. Poindexter appealed to the Hand County Board of Equalization (Board), which reversed the Director's decision and changed the assessment to reflect its use as grass/pasture land. This decision was appealed to the Hand County Commissioners, which reversed the Board's decision and held the original valuation was correct. Poindexter appealed to the circuit court, which conducted a hearing May 12, 1995.[1]

1. Board was not allowed to present testimony at this hearing, apparently as sanction by the circuit court for failing to follow a scheduling order.

The Board was permitted to cross-examine Poindexter's witnesses; however, Board's counsel, Hand County State's Attorney, apparently re-

[¶ 3] Poindexter's evidence and testimony at the hearing established that Poindexter used the land in question as grass or pasture for the last 40 years. The soil of the property varied between Class II and Class VI.[2] The property is affected by the extreme topography of the Ree Hills, with drastic drops in elevation. In letters dated March 23, 1993 and June 14, 1994, the Soil Conservation Service (SCS) informed Poindexter that the Class II soil, although some of the better cropable soil in Hand County, was not situated for use as cropland:

[T]he position of these soils on the landscape make them very susceptible to water erosion. The overhead run-off water comes from the steep hills to the southwest, flowing northeast across these flatter soils. If tilled annually, intense management practices would need to be installed to prevent severe water erosion problems. Strip cropping, residue management, grassed waterways, terraces and diversions would be needed. Twenty five to thirty percent of this land would have to remain in grassed waterways to control gully erosion; and terraces and diversions would have to be installed to slow the velocity of the run-off water. The best management practice to prevent erosion problems is to leave these areas in grassland.

Included in this unit are ... Class III and VI soils. They have a claypan subsoil that inhibits plant growth. Without residue cover these areas are very susceptible to wind and water erosion. The best management practice is to leave these areas in grassland.

The surface area of this area is inundated with rocks of various sizes which is uncharacteristic of these soils.

SCS letter, March 23, 1993. However, it is not clear from this letter which area of which township is being described as inundated with rocks.

[¶ 4] The June 14, 1994 letter is virtually identical, with the following commentary:

Expensive to install Grassed Waterways, Terraces, and Diversions would slow the velocity of run-off water. Strip cropping and residue management would also be crucial in controlling water erosion problems. These practices would need yearly maintenance and upkeep, also. A third of the cropable acres would be in grassed waterways, terraces, and diversions.

. . . .

An uncharacteristic feature of these soils in this area are the rocks of various sizes, on and near the surface, covering most of the area.

The 1994 letter also concludes that "the best management practice for these soils would be to leave them in grass." This letter is also vague regarding which area is designated as uncharacteristically rocky.

[¶ 5] At the close of the May 12, 1995 hearing, the circuit court ruled from the bench that the property should be appraised as grassland, and remanded to the Board to reassess the land accordingly. The Findings of Fact, Conclusions of Law, and Order reflecting the court's decision were signed June 26, 1995 and filed February 7, 1996. The Board did not appeal this decision.

[¶ 6] In April of 1995 (prior to the May 12 hearing), the Director had already assessed most of the property as cropland again. Poindexter requested a reclassification of the property. The Board affirmed Director's assessment. Poindexter again appealed to the circuit court. Another hearing was held November 13, 1995. The same property (eleven parcels) was the subject of the appeal, but three more parcels were included.[3] One of those three parcels is owned by Don Poindexter, not a party to the proceedings. The

---

fused to attend the hearing. The Director of Equalization, Rhonda Parmely, was present. The Board did not appeal this sanction.

2. There are eight classifications for soil as established by the United States Department of Agriculture's Soil Conservation Service. Class I is land that can be used for any type of conservation without intensive conservation practices. As

the classification number gets higher, the soil has capability restrictions. The four restrictions are erosion, climate, wetland, and the soil condition itself.

3. The Director testified the conditions on these three parcels are identical to the other 11 parcels.

court took judicial notice of the May 12, 1995 hearing, but only the transcript of the testimony presented on that date became part of this record.

[¶ 7] The first issue presented to the circuit court was whether the court's May 12, 1995 decision operated as res judicata to the relitigation of the proper classification and assessment of Poindexter's property.[4] The circuit court rejected this argument, stating:

> This case isn't about the method of assessment. This case is not about the assessment itself, but rather it goes to the rating that was found and in this case whether it was a crop/farm rating or a grass/pasture rating.
>
> That appears to me, this classification rating, whatever you want to call it appears to me to be akin to [a valuation] for assessment purposes. Therefore it's the ruling of this Court that res judicata does not apply.

[¶ 8] At the close of Poindexter's case, Board moved for a directed verdict, claiming Poindexter did not overcome the presumption of correctness. *See West Two Rivers Ranch v. Pennington Cty.*, 1996 SD 70, ¶ 7, 549 N.W.2d 683, 686 ("The assessor's valuation is presumed to be correct, and the taxpayer bears the burden to overcome this presumption."). The circuit court denied the motion, holding "[the evidence is] enough to overcome the presumption unless there's evidence to the contrary."

[¶ 9] The Director testified that she primarily relies upon soil maps produced by SCS and comparable sales in her assessment of agricultural property. If a piece of property can be used as cropland based upon its soil, it is assessed as cropland. If an owner chooses not to grow crops, she considers that a management decision which plays no part in the assessment, even if it is not economically feasible to grow crops because of the potential for erosion. Despite her position, and as an accommodation, she allowed for downward adjustments in some instances because of rocks, but stated that the land in Miller Township was not adjusted for rocks.

She also made downward adjustments for various other characteristics not evident from the soil maps, such as hills, channels, and escarpments.

[¶ 10] Board's expert, Arvid Meland (Meland), mapped soils for the SCS for 30 years. He agreed with the Director that the potential productivity of the soil is key to tax assessment. However, he noted that using the soil maps for tax assessment purposes could be flawed because certain features were often omitted, such as stoniness, pot holes, drainage systems with channels, and slopes. In response to complaints that the assessments ignored characteristics of the land not evident from the maps, Hand County hired Meland to conduct a rock study. He admitted he did not look at every piece of property in Hand County, but testified that he looked at every piece of land which Poindexter pointed out to him. In response to a hypothetical on cross-examination, he agreed that Class II land, if sloped, could not be farmed but testified that the "trouble spots" on Poindexter's property were rated as Class IV grassland.

[¶ 11] The circuit court issued its opinion on January 26, 1996, upholding the Board's decision. Findings of fact and conclusions of law were not filed until September 18, 1996. Poindexter appeals.

## STANDARD OF REVIEW

[¶ 12] The taxpayer bears a heavy burden in contesting a tax assessment:

> The appealing [Taxpayers] bear the burden of overcoming the presumption that the director of equalization's valuation was correct. They must produce sufficient evidence to show the assessed valuation was in excess of true and full value, lacked uniformity in the same class or was discriminatory. *Yadco, Inc. v. Yankton County*, 89 S.D. 651, 237 N.W.2d 665 (1975). Even if the director of equalization fails to fully comply with statutory mandates, rendering the assessment void, a taxpayer cannot avail himself of such inval-

4. Poindexter made it clear he was not including the three new parcels in the res judicata argu- ment.

idity without also showing that the tax levied was unjust and inequitable. *Brink v. Dann*, 33 S.D. 81, 144 N.W. 734 (1913). Substantial compliance with legislative directives is sufficient in determining assessed valuation. *Hot Springs v. Fall River Landowners*, 262 N.W.2d 33 (S.D.1978).

This court's proper scope of review of a trial court's decision in a trial de novo of an assessment matter is whether the decision of the trial court was "clearly erroneous." *Yadco, Inc. v. Yankton County, supra.*

*Knodel v. Board of County Comm'rs*, 269 N.W.2d 386, 389 (S.D.1978) (footnote omitted); *see also* SDCL 19–11–1 ("When substantial, credible evidence has been introduced to rebut the presumption, it shall disappear from the action or proceeding, and the jury shall not be instructed thereon."); *Bell v. East River Elec. Power Coop., Inc.*, 535 N.W.2d 750, 755 (S.D.1995):

The term "substantial, credible evidence" remains undefined, but certainly it "was intended to give a presumption greater strength by requiring much more to defeat it than a mere 'tapping on the window.'"

(Quoting John W. Larson, *South Dakota Evidence* § 301.1 (1991)).

[¶ 13] **1. WHETHER THE CIRCUIT COURT'S RULING ON THE 1994 ASSESSMENT MADE THE CLASSIFICATION ISSUE RES JUDICATA ON THE 1995 ASSESSMENT.**

■ [¶ 14] We have applied the doctrine of res judicata in a tax case.

In *Schell* [*v. Walker*, 305 N.W.2d 920 (S.D. 1981) ], we determined that the *method* of real estate tax assessment challenged was the same cause of action previously litigated in *Knodel. Schell*, 305 N.W.2d at 922–23. The complaint in *Schell* involved the same facts, alleged the same wrong and, nominally, involved the same parties; therefore, it was the same cause of action and res judicata operated as an absolute bar to relitigation. *Id.*

*Sabow v. Pennington Cty.*, 500 N.W.2d 257, 258 (S.D.1993) (emphasis added). However, a judicial determination of *value* for tax assessment purposes can not operate as res judicata in subsequent tax years. *Id.* at 259–60 ("It is of the essence of an assessment that it fixes a value as of a certain time. Each annual proceeding is separate and distinct from every other. Year by year an assessor must use his own judgment and must verify the roll .... the doctrine of res judicata can have no true application to the issues of value in recurring assessment proceedings.") (citation omitted).

■ [¶ 15] In this case, Poindexter argues it is not the value, or dollar figure, but the method by which the Board classifies land, which is barred by res judicata. In light of *Sabow, supra,* it appears he is correct that a prior decision concerning method of assessment can operate as res judicata, at least in the absence of a change of conditions or circumstances. However, we are unable to decide this case on this basis because of an incomplete record. No notice of entry of judgment of the earlier decision is contained in this record. Therefore, we are unable to ascertain whether the time for appeal on the prior decision has expired, because there is no proof of when notice of entry of judgment was given and filed, if ever. *See* SDCL 15–26A–6, which provides, in relevant part:

An appeal from the judgment must be taken within sixty days after the judgment shall be signed, attested, filed *and* written notice of entry thereof shall have been given to the adverse party.

(Emphasis added). *See also In re Sales & Use Tax Refund Request of Media One, Inc.,* 1997 SD 17, ¶ 7, 559 N.W.2d 875, 877:

A notice of entry of judgment gives to a party the power to set running the time after which his adversary may not appeal and assures each party that the statutory period of time within which he may appeal does not commence to run until his adversary has given such notice.

(Citing *Kallstrom v. Marshall Beverages, Inc.*, 397 N.W.2d 647, 650 (S.D.1986)). Res judicata applies if, among other factors, there was a *final* judgment on the merits. *D.G. v. D.M.K.*, 1996 SD 144, ¶ 27, 557 N.W.2d 235, 240. A judgment is not final if the time in which a party may appeal has not yet run. *See Kallstrom*, 397 N.W.2d at 650 ("Since the

statutory period did not commence due to [appellee's] failure to provide written notice of entry under SDCL 15–26A–6, the motion to dismiss is denied.").

■ [¶ 16] Since no notice of entry of judgment appears in this record, we are unable to reach the merits of the res judicata argument. Accordingly, we affirm the trial court on this issue, but for different reasons. "Where a judgment is correct, this court will not reverse although it was based on incorrect reasons or erroneous conclusions." *Wolff v. Secretary, SD Game, Fish & Parks Dep't,* 1996 SD 23, ¶ 50, 544 N.W.2d 531, 540 (Sabers, J., dissenting); *Sommervold v. Grevlos,* 518 N.W.2d 733, 740 (S.D.1994) ("[A] trial court may still be upheld if it reached the right result for the wrong reason.") (citation omitted).

[¶ 17] **2. WHETHER THE CIRCUIT COURT BASED ITS DECISION ON THE PRESUMPTION OF CORRECTNESS DESPITE DENIAL OF THE MOTION FOR DIRECTED VERDICT.**

■ [¶ 18] Poindexter claims the court based its decision on the conclusion that he did not overcome the presumption of correctness. He argues that this was incorrect because, by denying the motion for directed verdict, the court agreed that he did overcome the presumption. What Poindexter misapprehends is the effect the circuit court's memorandum opinion had on the final judgment. The circuit court stated in its memorandum opinion that Poindexter did not overcome the presumption of correctness; however, no mention is made of the presumption in the court's findings of fact or conclusions of law. Moreover, the court did not incorporate its memorandum opinion in its findings or conclusions. "[I]t is settled law that we do not review the trial court's memorandum opinion unless the same is expressly incorporated in the trial court's findings of fact and conclusions of law." *Linard v. Hershey,* 516 N.W.2d 304, 305 (S.D.1994) (quoting *Olson v. Olson,* 438 N.W.2d 544, 547 (S.D.1989)).

As its name implies, a memorandum opinion is merely an expression of the trial court's opinion of the facts and law. Any expression of opinion or views by the trial judge extraneous to his decision in the manner and form contemplated by law is of no binding force and effect as a matter of law either upon the trial judge himself or anyone else. Because the memorandum opinion is not binding, our review is limited to the trial court's findings of fact and conclusions of law.

*Id.* (citations & internal quotations omitted).

[¶ 19] **3. WHETHER THE BOARD'S METHOD OF VALUATION COMPLIED WITH SDCL 10–6–33.1.**

[¶ 20] Poindexter argues that the Board overlooks or misconstrues the statute which sets forth the factors to be considered in determining the value of agricultural land.

The true and full value in money of agricultural land, as defined by § 10–6–31, which has been in primarily agricultural use for at least five successive years immediately preceding the tax year for which assessment is to be made shall be the market value as determined for each county through the use of all comparable sales of agricultural land based on consideration of the following factors:

(1) The capacity of the land to produce agricultural products as defined in § 10–6–33.2; and

(2) The soil, terrain and topographical condition of the property including but not limited to capability, the land's use, climate, accessibility and surface obstructions which can be documented through an analysis of land selling prices;

The comparable sales that are used shall be evidenced by an instrument recorded with the register of deeds of the county in which the land is located, if the date of such instrument and the recording date is not more than two years prior to the assessment year.

SDCL 10–6–33.1.

[¶ 21] Poindexter first argues that Board failed to take into account the topography of the land in determining the capacity of the land to produce agricultural products under

subdivision (1). The record belies this claim. The Director testified that she assessed the land making downward departures by adjusting for rocks, escarpments, and channels; furthermore, she did not apply a blanket assessment of "cropland." In fact, she assessed part of the land by applying a crop rating and part by applying a grass rating.

■ [¶ 22] Poindexter next argues the present use of the land as pasture land was ignored. Board responds the decision not to farm the cropable land constitutes a management decision. We discussed this issue in *Mortenson v. Stanley County*, 303 N.W.2d 107 (S.D.1981): "Although actual use may be a factor in determining the valuation of certain property, a landowner should not be able to determine the valuation of property by using it as rangeland when it could be used as cropland." *Id.* at 111 (footnote omitted). Poindexter argues the erosion factor should have overridden any conclusion the land was capable of producing crops. As we observed in *Mortenson,* the soil survey, which was relied upon by the assessor in that case and in the present one, takes into account the slope of land as well as other factors in determining whether land is cropland or rangeland. *Id.* at n. 4. Here, the Director went beyond the maps by including Meland's rock study in her assessment.

■ [¶ 23] Poindexter next claims that sections of the cropable land are inaccessible by tractor. A review of the record demonstrates this was not testified to by Poindexter nor established at trial. Issues not presented to the trial court will not be addressed by this court for the first time on appeal. *City of Watertown v. Dakota, Minn. & E. R.R. Co.,* 1996 SD 82, ¶ 26, 551 N.W.2d 571, 577.

[¶ 24] Poindexter claims the assessor did not take into account the rocks on his property. However, as noted, Hand County hired Meland to document the rocky conditions of the county so it could adjust its assessments accordingly. He did not designate Miller Township as requiring adjustments for rocks.

Poindexter provides no proof the exclusion of the township was in error. The SCS letter of March 23, 1993 pertains to property in both Miller Township *and* Midland Township and states, "The surface area of this area is inundated with rocks of various sizes which is uncharacteristic of these soils." It is not clear from the SCS letter which township is included in the description uncharacteristically rocky.

[¶ 25] Finally, Poindexter argues that the comparable sales upon which the Board relied to ascertain the market value of the land were not "comparable." He claims they were unreliable because none occurred in the Ree Hills area. We note that the law requires the sale to take place, not in the same area, but simply the same county, or even adjoining counties if an inadequate number of sales occurred within the county. SDCL 10–6–64.

■ [¶ 26] Poindexter has not shown the trial court was clearly erroneous in upholding the Director's assessment. *Knodel,* 269 N.W.2d at 389. Even though the SCS letters initially appear somewhat persuasive, they do not, standing alone, establish that the Director's method of valuation failed to comply with SDCL 10–6–33.1. Even if Poindexter were able to prove the Board did not comply with SDCL 10–6–33.1, he must then show "that the tax levied was unjust and inequitable." *Id.* He offered no proof to show the valuation was unfair. There was no showing that the assessed valuation of his land exceeded the actual value of the land. In fact, he testified that he never independently established a market value on the land. Therefore, Poindexter did not meet his burden as defined by this court. *See Lincoln Township v. South Dakota Bd. of Equalization,* 1996 SD 13, ¶ 26, 543 N.W.2d 256, 260 (stating that presumption of correctness can not be overcome without an appraisal showing the assessment was erroneous) (citing *Knodel,* 269 N.W.2d at 389; *Roseland v. Faulk Cty. Bd. of Equalization,* 474 N.W.2d 273 (S.D. 1991) (presumption overcome by evidence of excessive valuation, which was demonstrated

by evidence of three instances where the assessed value of Faulk County agricultural property exceeded its actual value)).

[¶ 27] For all of the foregoing reasons, the decision of the circuit court upholding the assessment of the property is affirmed.[5]

[¶ 28] MILLER, C.J., and AMUNDSON, KONENKAMP and GILBERTSON, JJ., concur.

---

5. Because both sides concede that the 3 added parcels are similar in terrain and location to the original 11, there is no need to separately discuss the method of assessment with relation to the 3 parcels. Therefore, our disposition of this case applies to all 14 parcels of land, with the exception of any which may belong to a non-party. The circuit court held that Poindexter did not have standing to contest assessment on that piece of property and he did not appeal that ruling.