2000 SD 95

**Richard AMUNDSON Appellee,**

v.

**SOUTH DAKOTA BOARD OF PARDONS & PAROLES, Appellant.**

**No. 21216.**

Supreme Court of South Dakota.

Considered on Briefs May 30, 2000.

Decided July 19, 2000.

· Richard L. Travis and Deborah A. Birgen of May, Johnson, Doyle and Becker, P.C., Sioux Falls, South Dakota, Attorneys for appellee.

Mark Barnett, Attorney General, Gary Campbell, Assistant Attorney General, Pierre, South Dakota, Attorneys for appellant.

SABERS, Justice.

[¶ 1.] The Board of Pardons and Paroles revoked the suspended sentence of Richard E. Amundson and ordered that he serve the remainder of his sentence, one year, in the state penitentiary. The circuit court reversed. The Board appeals and we reverse.

## FACTS

[¶ 2.] Amundson was convicted of possession of a firearm by a felon and was sentenced to serve a term of two years with one year suspended. He was incarcerated from December 10, 1997 to December 10, 1998 when he was released under "intensive supervision." Pursuant to the Suspended Sentence Agreement that he signed, Amundson agreed that he would not "own, purchase or have under [his] control, possess, transport or use weapons ... considered [to be] dangerous by [his] Parole Agent...." Duane Ries, Amundson's sponsor, specifically asked Parole Agent Greg Barnett whether Amundson could possess a kitchen knife. Barnett approved Amundson's possession of a kitchen knife:

> I told him that a knife that would be in the kitchen used only for kitchen purposes would be appropriate, but a knife on his person or used for something like as a weapon would be a violation of his parole or suspended sentence.

Ries testified that Barnett merely approved the knife for preparation of food and things associated with "everyday living." Neither version of the oral instructions was reduced to writing.

[¶ 3.] Amundson lived with Ries and his family out on their farm for nine days until he could find an apartment in Sioux Falls. On December 19, Ries helped Amundson move into a one-room efficiency apartment and supplied him with some kitchen utensils, including a kitchen knife. That night and the next night, Amundson heard loud voices from the neighboring apartment from 12:00 a.m. to 2:00 a.m. He could not understand what they were saying because they were speaking and yelling in Spanish. He testified that he heard "bottles and things being clinked around in the neighbor's apartment" and thought he "detected the odor of marijuana smoke." He also testified that he was "concerned" about the neighbors' behavior and discussed the situation with Ries. Ries confirmed this conversation:

> [Amundson] said he had been awakened the previous nights by loud noise from the adjacent apartment and that was occurring late at night, or somewhere around the midnight hour and he thought that they were probably getting off from work and, [ ] they were coming in and being very noisy [ ] in that process.

Amundson testified that he felt intimidated by the noise because the neighbors seemed to be fighting or cursing in Spanish, a language he did not understand.

[¶ 4.] Barnett had six personal contacts and six collateral contacts [1] with Amundson between December 10 and December 21. Barnett testified and noted in his violation report that Amundson complied with all the conditions and "had been mostly agreeable to his supervision and all imposed conditions." In fact, there was testimony that Amundson was acting as a "model parolee."

[¶ 5.] Amundson testified that at 8:00 p.m. on December 21, 1998, he laid out his clothing and equipment for his first day of work the next morning at Sioux Steel and went to bed at 9:00 p.m. At 11:32 p.m., Barnett and Parole Agent Travis Ripperda arrived at Amundson's apartment to conduct a random curfew check. As they entered the building, they heard a "commotion" from the apartment next to Amundson's and identified the occupants as Hispanic. The agents testified that they knocked on Amundson's door three times. Despite the fact that this was the first curfew check conducted on Amundson and despite an internal policy,[2] the agents failed to identify themselves.

[¶ 6.] Inside the apartment, Amundson was asleep. He woke up and listened when he heard "pounding" on his door. He testified that the "pounding" continued so he called out and asked who was there, but received no response. The "pounding" continued again so he claimed he got out of his bed and shouted, "who is there," but received no response. He stated that he was concerned that it might be the neighbors and that he grew "very nervous" because his door is secured with only a single bolt and was without a peephole or chain. He grabbed the kitchen knife, which had a six and one-half inch blade, and stuck it in the waistband of his jeans behind his back. Dressed only in his jeans, he approached the door and heard his neighbors "jibbering in Spanish." He claims he asked a third time, "who is it," but there was no response.

[¶ 7.] Barnett and Ripperda claim that they did not hear any requests for identifi-

---

1. These "collateral contacts" consisted of telephone calls to Barnett from Amundson.

2. The testimony was:
   Q: Now, just, this is just a procedural matter, when you do these visits on intensive parole and you knock on the door do you announce who you are if you're asked? Is that procedure?
   A: We always do it, we always announce ourselves, yes.
   * * *
   Q: So on this particular occasion you didn't, you did not ... announce to him who you were?
   A: No, we didn't.

cation from Amundson. Amundson testified that he put his left foot up against the door and slowly opened the door. At that point, he recognized Barnett and opened the door.

[¶ 8.] Once inside, Ripperda administered a breathalyzer test while Barnett looked around the apartment. According to Amundson, after he finished taking the breathalyzer test, he told Ripperda that he started a new job the next morning. As he was talking, he claims that he turned his back to Ripperda and stepped into the kitchen area, faced the kitchen sink, removed the knife from his waistband and placed it on the counter in front of him. Because his back was towards Ripperda, he claims that Ripperda saw him openly remove the knife from his waistband. Conversely, Ripperda testified that Amundson stepped backward into the kitchen area and "discreetly" removed the knife from his waistband while he was facing Ripperda. Ripperda also testified that Amundson reached behind his back, took the kitchen knife out of his waistband and "set it on the counter *right in front of him.*" (emphasis added). It is undisputed that Amundson did not use the knife in a threatening manner or make threatening statements or motions with the knife toward the agents.

[¶ 9.] Once confronted, Amundson explained that he possessed the knife because he was "scared" as he was new in the apartment building and did not know who was at his door. Barnett repeatedly testified that Amundson truthfully answered all of the questions, fully cooperated and did not feel that the situation was dangerous. However, Barnett and Ripperda concluded that Amundson's possession of the knife on his person was a violation of his suspended sentence agreement. They handcuffed Amundson and took him to jail.

[¶ 10.] Barnett reported the violation to the Board on December 22, 1998. On January 4, 1999, the Board concluded that probable cause existed to believe that Amundson violated the terms of his Suspended Sentence Agreement. A hearing was conducted on March 25, 1999. On March 30, 1999, the Board concluded that Amundson's conduct was a violation of his suspended sentence. The Board's findings of fact and conclusions of law, dated April 7, 1999, do not provide that Amundson lacked credibility. The ten days during which Amundson was released were considered "dead time" and he was ordered to jail until December 20, 1999.

[¶ 11.] Amundson appealed the Board's decision to the circuit court. A hearing was held on October 4, 1999. The Board argued that Amundson intended to use the kitchen knife as a weapon, if the need arose, and this intention violated the conditions of his suspended sentence. In addressing the Board's position, the circuit court stated:

> [Y]ou are in effect saying if a parolee is told they may not under any conditions have a weapon and then the State does things to put them in fear of their life or their personal safety and they have a weapon, they are going to get violated. That causes a problem.... Is the State coming here with clean hands then?

The circuit court determined that the agents created the situation by failing to identify themselves and that Amundson had reasonable concern for his safety. It concluded that the Board's decision was clearly erroneous. By Order, dated October 12, 1999, Amundson was to be immediately released from the South Dakota State Penitentiary and placed under the Board's supervision until his suspended sentence was served in full. The circuit court reinstated the ten days of "dead time" and determined that his suspended sentence terminated on December 10, 1999. However, the trial court later determined, during a bond hearing, that the Board's appeal stayed the Order under SDCL 15–26A–38 and Amundson was denied release on bond pending the appeal.

The trial court did not enter any findings of fact or conclusions of law.

[¶ 12.] The Board appeals.

## STANDARD OF REVIEW

[¶ 13.] In reviewing decisions from the Board of Pardons and Paroles:

The court shall give great weight to the findings made and inferences drawn by an agency on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions or decisions are:

* * *

5) [c]learly erroneous in light of the entire evidence in the record; or

6) [a]rbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

SDCL 1-26-36. *See also Hughes v. South Dakota Bd. of Pardons,* 1999 SD 44, ¶ 11, 593 N.W.2d 789, 791 (quoting *In re Brown,* 1997 SD 133, ¶ 7, 572 N.W.2d 435, 436-37).

[¶ 14.] **1. WHETHER THE BOARD ERRED IN REVOKING THE SUSPENDED PORTION OF AMUNDSON'S SENTENCE.**

[¶ 15.] The Board first argues that it was not clearly erroneous in determining that Amundson's explanation of his acts did not justify his concealing a knife in his waistband when he answered his door on December 21, 1998. The Board, therefore, argues that the evidence is insufficient to support the circuit court's characterization of that night; namely, the agents were not at fault for Amundson's decision to arm himself with a concealed weapon. Additionally, the Board claims that it properly determined Amundson violated the conditions of his agreement due to its zero-

tolerance policy which was intended to protect its unarmed parole agents.

[¶ 16.] Condition four of Amundson's Suspended Sentence Agreement provides:

I will not own, purchase or have under my control, possess, transport or use weapons or explosives considered dangerous by my Parole Agent, or any type of firearm.

Barnett permitted Amundson to own, possess and use a knife for kitchen purposes. The instructions accompanying this permission were not reduced to writing and are disputed.

[¶ 17.] Amundson argues that there is a distinction between the words "possession" and "use." He points out that he was permitted to possess the knife and, while he *possessed* the knife, his hands were empty and in front of him when he opened his door. He further claims that he never displayed the knife until he placed it on the kitchen counter. Therefore, he argues that the facts clearly reflect that he never *used* the knife as a weapon and the Board was clearly erroneous in determining that he violated the terms and conditions of his suspended sentence agreement.

[¶ 18.] As indicated, the verbal instructions from Barnett to Amundson, given when Barnett excluded the ownership, possession and use of a kitchen knife from condition four of the agreement, were not reduced to writing and are disputed. The Board, however, found that "Amundson was told by [Barnett] that it was acceptable for him to have a knife for kitchen and cooking-related purposes, but that it was not allowable for him to use the knife for other purposes." The Board also found that Amundson's "use of the knife as a weapon" was not justified by his explanation and his "use of the knife ... was clearly a use of the knife as a potential weapon." There is evidence to support these findings.

[¶ 19.] When Amundson opened the door to allow the agents to enter his apartment,

he unquestionably possessed a knife. That possession constitutes using the knife as a potential weapon. Amundson attempts to justify his use of the knife in this manner by asserting that he was uncertain who was at the door and that he was "scared." However, Amundson had a reasonable alternative to using the knife as a potential weapon. For example, he could have insisted on identification before he opened the door or left the knife in the kitchen. *See United States v. Lomax*, 87 F.3d 959, 962 (8th Cir.1996) (holding that the defendant, a convicted felon, was not legally justified in possessing a firearm because potentially effective legal options existed). Therefore, the Board's findings, that Amundson's use of the knife was a violation of his agreement, were not clearly erroneous.

[¶ 20.] Further, the Board found that "Amundson was instructed that having a knife on his person would be a violation of his supervision." In support of this finding, Barnett testified that he told Amundson that a "knife on his person ... would be a violation of his ... suspended sentence." Amundson disputes that this was communicated to him. However, it is not this court's role to act as the factfinder. Instead, "great weight [is given] to the findings made and inferences drawn by [the Board] on questions of fact." SDCL 1–26–36.

[¶ 21.] The Board found that Amundson did not comply with Barnett's instruction that "having a knife on his person would be a violation of his supervision." Therefore, it concluded that Amundson violated condition 10 of his agreement, which provides: "I will comply with all instructions in matters affecting my supervision, and cooperate by promptly and truthfully answering inquires directed to me by a Parole Agent." Clearly, the Board was "reasonably satisfied" that the terms of the suspended sentence were violated and it's findings were not shown to be clearly erroneous. Consequently, we reverse.

[¶ 22.] In light of our determination on Issue 1, we need not reach the next two issues. However, we do so for the future benefit of the bench and the bar.

[¶ 23.] **2. WHETHER THE CIRCUIT ERRED IN FAILING TO APPLY THE PROPER STANDARD OF REVIEW.**

[¶ 24.] The circuit court determined that the facts justified Amundson's possession of the knife. The Board argues that in making this determination, the circuit court failed to apply the proper standard of review and erroneously substituted its own judgment for that of the Board.

[¶ 25.] As stated above, in reviewing a decision from the Board, the function of the circuit court and this court is to determine whether the Board's findings were clearly erroneous. While the Board's conclusions of law are reviewable de novo, "great weight [is given] to the findings made and inferences drawn by [the Board] on questions of fact." SDCL 1–26–36.

[¶ 26.] Although the agents failed to identify themselves to Amundson at 11:30 p.m., they claim they did not hear him ask for their identification. In addressing this issue, the circuit court exceeded its appellate role and mis-characterized some of the events. For example, the court stated that it was not surprised that the agents did not hear Amundson ask who was at the door because the neighbors were "screaming" in the next apartment. Amundson's testimony was that he heard his neighbors "jibbering in Spanish" once he approached the door, not "screaming." The court also found that the agents "repeatedly refused to identify themselves." The agents testified that they did not hear Amundson ask for their identification. As we have stated before, "[t]he trier of fact is permitted to determine the questions of fact and to choose one opinion over that of another when that opinion is properly supported by the evidence." *Erickson v. Minnesota Gas Co.*, 358 N.W.2d 526, 528 (S.D.1984).

**[¶ 27.] 3. WHETHER THE CIRCUIT COURT ERRED IN FAILING TO ENTER FINDINGS OF FACT AND CONCLUSIONS OF LAW.**

[¶ 28.] During the hearing, the circuit court stated "I'm not the fact finder" and refused to enter into findings of fact and conclusions of law. The Board claims that the circuit court's refusal to enter mandatory findings of fact and conclusions of law requires reversal. Amundson agrees in part and argues that if we determine that the Board's revocation was not error, then the circuit court erred in refusing to enter into findings of fact and conclusions of law (citing *State, Div. of Human Rights ex rel. v. Miller*, 349 N.W.2d 42 (S.D.1984)).

[¶ 29.] SDCL 1–26–36 provides, in part: "A court *shall* enter its own findings of fact and conclusions of law *or* may affirm the findings and conclusions entered by the agency as part of its judgment." (emphasis added). The statutory language is clear and provides that the court "shall" enter its own findings of fact and conclusions of law when reversing or modifying an administrative agency's decision. *See Miller*, 349 N.W.2d at 45 (interpreting this statute as "requir[ing] the circuit court to enter its own findings and conclusions if it modifies or reverses the agency."). The statutory language is *mandatory* and the circuit court was *required* to enter its own findings and conclusions.

[¶ 30.] In *Schroeder v. Dep't of Social Services*, 529 N.W.2d 589, 591 (S.D.1995), we were presented with a similar situation. In interpreting SDCL 1–26–36, we stated: "[s]ince the circuit court reversed [the Board's] findings and conclusions, the plain language of SDCL 1–26–36 requires the court to enter separate findings of fact and conclusions of law specifying where and why [the Board's] decision was in error."

We further determined that the circuit court's decision and order are not valid substitutes for the required findings and conclusions. In remanding the case to the circuit court, we stated:

[C]ircuit courts, acting as a reviewing court for administrative decisions, must clearly articulate findings of fact and conclusions of law to support their decisions. Without entering findings of fact and conclusions of law, this court cannot decipher why the circuit court reversed the trier of fact in this case. Therefore, we remand for the entry of specific findings of fact and conclusions of law providing reasons for reversing Commission's decision.

*Id.* at 592 (internal citation omitted). In other words, to comply with SDCL 1–26–37,[3] the court must make findings of fact and conclusions of law when reversing or modifying the agency's decision. It failed to do so and thereby erred.

[¶ 31.] Similarly, we would reverse and remand this case to the circuit court for both reasons (to apply the proper standard of review and to enter specific findings of fact and conclusions of law) if we had not already concluded, under Issue 1, that the Board did not err in revoking Amundson's sentence.

[¶ 32.] Reversed.

[¶ 33.] MILLER, Chief Justice, and KONENKAMP and GILBERTSON, Justices, concur.

[¶ 34.] AMUNDSON, Justice, dissents.

AMUNDSON, Justice (dissenting).

[¶ 35.] I respectfully dissent.

[¶ 36.] This Court previously held in *Schroeder v. Department of Soc. Servs.*, 529 N.W.2d 589, 591 (S.D.1995), that

---

**3.** This statute provides:

An aggrieved party or the agency may obtain a review of any final judgment of the circuit court under this chapter by appeal to the Supreme Court. The appeal shall be taken as in other civil cases. *The Supreme*

*Court shall give the same deference to the findings of fact, conclusions of law and final judgment of the circuit court as it does to other appeals from the circuit court.* Such appeal may not be considered de novo. (emphasis added).

"SDCL 1–26–36 *requires* the court to enter separate findings of fact and conclusions of law specifying where and why Commission's decision was in error." (Emphasis added.) Further, we held that the "circuit courts, acting as a reviewing court for administrative decisions, *must clearly articulate findings of fact and conclusions of law to support their decisions.*" *Id.* at 592 (emphasis added). Therefore, the entering of findings of fact and conclusions of law by the circuit court are mandatory, not discretionary. *See id.*

[¶ 37.] In the present case, the circuit court refused to enter findings of fact and conclusions of law to support its reversal of Board of Pardons and Paroles. As we stated in *Schroeder*, "[w]ithout entering findings of fact and conclusions of law, this court cannot decipher why the circuit court reversed the trier of fact in this case." *Id.* Before a meaningful appellate review can be conducted on *any* of the issues in this case, I would remand this action to the circuit court with instructions to enter the mandatory findings and conclusions.