#23914-a-JKM

**2006 SD 65**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

CHRISTOPHER J. AUSTAD,                    Appellant,

    v.

SOUTH DAKOTA BOARD OF
PARDONS AND PAROLES,                    Appellee,

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE KATHLEEN K. CALDWELL
Judge

\* \* \* \*

JASON W. SHANKS of
May & Johnson, P.C.
Sioux Falls, South Dakota                    Attorney for appellant.

LAWRENCE E. LONG
Attorney General

FRANK GEAGHAN
Assistant Attorney General
Pierre, South Dakota                    Attorneys for appellee.

\* \* \* \*

ARGUED ON MAY 25, 2006

OPINION FILED **07/19/06**

#23914

MEIERHENRY, Justice

[¶1.]        Christopher Austad (Austad) was sentenced to ten years in the South

Dakota Penitentiary for grand theft.  The sentencing court suspended six of those

ten years.  In preparation for his release from the Penitentiary to serve his

suspended term, Austad signed a suspended sentence supervision agreement

(supervision agreement) which subjected him to certain conditions.  Prior to his

release, Austad allegedly violated two of the conditions.  Upon review, the Board of

Pardons and Parole (Board) found that Austad violated the supervision agreement

and revoked Austad's six-year suspended sentence.  Austad challenges the Board's

action.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

[¶2.]        For the crime of grand theft, Austad received a sentence of ten years in

the Penitentiary with six years suspended.  He was scheduled to be released on

supervision January 9, 2005.  On December 11, 2004, Austad submitted a request to

penitentiary mental health staff which read:

> If you want to know what go's (sic) on through my everyday
> thought.  Here you go!  These are what my true thoughts are.  I
> am going to my suspended time when I leave prison.  If you feel
> I need mental help then get on it A.S.A.P!  Until then . . . I don't
> know.

Attached to the note was an eight page journal-type document which contained

detailed descriptions of violence against unnamed persons.

[¶3.]        On December 29, 2004, Austad was presented with a supervision

agreement containing the conditions and rules of Austad's supervised release.  The

initial paragraph of the agreement stated:

-1-

> I have been made aware that SDCL § 23A-27-19 provides that: Any person whose sentence is suspended pursuant to this section is under the supervision of the Board of Pardons and Paroles. Also, I understand and agree that in the event I violate parole prior to my suspended sentence commencing, the Board has the authority to revoke the suspended portion, impose the entire sentence; and I may not be given credit for time spent on suspended sentence. The Board is charged with the responsibility for enforcing the conditions imposed by the sentencing judge and the Board retains jurisdiction to revoke the suspended portion of the sentence for violation of the terms of the suspension.

The agreement then stated, "[i]n consideration of Parole and/or Suspended Sentence/Supervision being granted me, I agree to the following." The next fourteen numbered paragraphs detailed the conditions of Austad's release. Paragraph 12 specifically provided that any pre-release violation of penitentiary rules could result in a violation of the agreement. Paragraph 12 stated, "I understand that violation of any institutional rule before my actual release from the institution may be considered a violation of my supervision agreement." Additionally, Paragraph 14 prohibited certain behaviors as follows: "I will not engage in any assaultive, abusive, or violent behavior, including stalking, or threats of violence." Austad signed the agreement on December 29, 2004.

[¶4.]        On January 5, 2005, mental health professionals Tom Gilchrist (Gilchrist) and Don Baum (Baum) met with Austad to discuss his mental health request of December 11, 2004. During the meeting, Austad commented that if he were released, he would kill others and then himself. He also stated that if he met with his parole officer, he would "put two bullets in his skull" in "assassination style." When further questioned, Austad identified his parole officer as "Mark" whose last name began with the letter "K." After the meeting, Gilchrist submitted

an informational report to prison officials which detailed the statements Austad made during the meeting.

[¶5.]     Report of Austad's statements went to both the Department of Corrections (DOC) and the Board of Pardons and Paroles (Board), and both entities responded. DOC proceeded with disciplinary action and the Board scheduled a violation hearing. DOC's disciplinary action accused Austad of violating DOC rules and regulations by "threatening any non-inmate—staff." Austad "verbally accepted sanctions" of 90 days in disciplinary segregation for the DOC rule violation.

[¶6.]     The Board's violation report alleged that Austad violated conditions 12 and 14 of the December 29, 2004 supervision agreement. At the Board's probable cause hearing on January 13, 2005, and after being advised of his rights, Austad testified and denied violating his supervision agreement. The Board then proceeded with a revocation hearing and concluded that Austad violated the terms of his suspended sentence, specifically conditions 12 and 14 of his supervision agreement. As a result, the Board revoked Austad's suspended time and imposed the remainder of his original ten year sentence.

[¶7.]     Austad appealed the Board's decision to circuit court. The trial court determined that the Board met its burden of proof in showing that Austad violated conditions 12 and 14 of his suspended sentence agreement. The court also concluded that the imposition of Austad's suspended sentence did not violate his constitutional rights. Finally, the court determined that conditions 12 and 14 were reasonable. Austad appeals the trial court's decision and presents the following issues for our consideration:

## ISSUES

1. Whether the Board met its burden of proving that Austad violated the conditions of his supervision agreement.

2. Whether Austad's equal protection rights were violated.

3. Whether conditions 12 and 14 were unreasonable.

4. Whether the Board's decision was clearly erroneous.

## STANDARD OF REVIEW

[¶8.]     An appeal from the Board is governed by SDCL 1-26-37.  Lee v. S.D. Bd. of Pardons & Paroles, 2005 SD 103, ¶6, 705 NW2d 609, 611.  Therefore, "[w]e review questions of fact under the clearly erroneous standard; mixed questions of law and fact and questions of law are reviewed de novo." *Id.*  Further, "[m]atters of discretion are reviewed under an abuse of discretion standard." *Id.*  As we have noted,

> The standard of proof required for a criminal conviction is not necessary to revoke a suspended sentence.  Before the Board may revoke the suspended portion of a sentence, it must be "reasonably satisfied" that the terms of the suspension have not been followed.  So long as there is adequate evidence to support that minimal level of scrutiny, the Board has not abused its discretion in revoking the suspended sentence and its decision should be upheld.

*In re* Brown, 1997 SD 133, ¶8, 572 NW2d 435, 437 (citations omitted); *see also* Amundson v. S.D. Bd. of Pardons & Paroles, 2000 SD 95, ¶21, 614 NW2d 800, 805 (applying the "reasonably satisfied" standard); Hughes v. S.D. Bd. of Pardons & Paroles, 1999 SD 44, ¶11, 593 NW2d 789, 791 (noting the "reasonably satisfied" standard).

**DECISION**

*Violation of Conditions of Supervision Agreement*

[¶9.]    Austad argues that the Board failed to present sufficient evidence to prove that he violated the terms of the supervision agreement.  According to Austad, the Board had to prove that his statements constituted "true threats" under the First Amendment of the United States Constitution.  Without such proof, Austad argues, his statements are protected speech and cannot constitute a violation of his supervision agreement.

[¶10.]    While the First Amendment guarantees citizens the right of free speech, the government may regulate certain categories or modes of expression. Virginia v. Black, 538 US 343, 358-59, 123 SCt 1536, 1547-48, 155 LEd2d 535 (2003).  It is well established that "the First Amendment . . . permits a State to ban a 'true threat.'"  *Id.* at 359, 123 SCt at 1548, 155 LEd2d 535; *see also* Watts v. United States, 394 US 705, 707-08, 89 SCt 1399, 1401-02, 22 LEd2d 664 (1969); People *ex rel* C.C.H., 2002 SD 113, ¶12, 651 NW2d 702, 706.  The "true threat" doctrine originated in the context of a criminal prosecution.[1]  *See Watts*, 394 US at

---

1.    *Watts* considered a federal statute prohibiting knowing, willful threats against the President of the United States.  *Id.* at 706, 89 SCt at 1401, 22 LEd2d 664.  During a public rally, the defendant stated, "If they ever make me carry a rifle the first man I want to get in my sights is L.B.J."  *Id.*  The Court concluded that the statute requires proof of a "true threat."  *Id.* at 708, 89 SCt at 1401, 22 LEd2d 664.  The court reasoned:

> "[W]e must interpret the language Congress chose 'against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wideopen, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.  The

(continued . . .)

707-08, 89 SCt at 1401-02, 22 LEd2d 664. It has since been applied by many courts to determine whether speech was punishable or protected by the First Amendment. *See, e.g.*, Doe v. Pulaski County Sch. Dist., 306 F3d 616 (8thCir 2002) (considering whether expulsion of a student for making threats violated the First Amendment); *C.C.H.*, 2002 SD 113, 651 NW2d at 702 (reversing a delinquency adjudication of a boy who made threatening statements at school). It is important in this case to note that the "true threats" doctrine also has been applied to statements made inside prison walls. *See, e.g.*, United States v. Stewart, 420 F3d 1007 (9thCir 2005) (finding that statements made by inmate to informant constituted "true threats" despite inmate's incarcerated status and affirming inmate's conviction for threatening to murder a federal judge); United States v. Miller, 115 F3d 361 (6thCir 1997) (affirming conviction for threatening President based on "true threats" contained in inmate-defendant's letter); United States v. Glover, 846 F2d 339 (6thCir 1988) (finding that inmates' letters threatening the President contained "true threats" and upholding their convictions).

––––––––––––––––––

(. . . continued)

> language of the political arena, like the language used in labor disputes, is often vituperative, abusive, and inexact. We agree with petitioner that his only offense here was 'a kind of very crude offensive method of stating a political opposition to the President.'" Taken in context, and regarding the expressly conditional nature of the statement and the reaction of the listeners, we do not see how it could be interpreted otherwise.

*Id.* at 708, 89 SCt at 1401-02, 22 LEd2d 664. Because the Court held that the statement was not a "true threat," it reversed the conviction and remanded for judgment of acquittal. *Id.* at 708, 89 SCt at 1402, 22 LEd2d 664.

[¶11.]     The Board argues, however, that the "true threats" doctrine does not apply here. Both parties agree that while inmates retain free speech rights, those rights may be limited. We have not previously addressed the scope of an inmate's First Amendment rights, but the United States Supreme Court recently reiterated that "the Constitution sometimes permits greater restriction of [First Amendment] rights in a prison than it would allow elsewhere." Beard v. Banks, ____ US ____, ____, 126 SCt 2572, 2577-78 (2006). Prison regulations which impinge First Amendment rights are permissible if they are "reasonably related" to legitimate penological interests and are not an "exaggerated response" to those objectives. *Id.* at ____, 126 SCt at 2578 (quoting Turner v. Safley, 482 US 78, 87, 107 SCt 2254, 2261, 96 LEd2d 64 (1987)).

[¶12.]     In this case, Austad does not challenge the supervision agreement or any prison regulation as an unreasonable restriction of his First Amendment right. He argues only that his speech was not a "true threat" and therefore was protected by the First Amendment. Neither party has presented any cases considering the "true threats" doctrine in the context of prison discipline or parole/suspended sentence revocation. Because the doctrine applies to criminal prosecutions of inmates, we will apply it in this case. Thus, our inquiry centers on whether Austad's statements were "true threats" which could form the basis of punishment or whether his statements were protected by the First Amendment.

[¶13.]     In determining what constitutes a true threat, the United States Supreme Court explained,

> "True threats" encompass those statements where the speaker
> means to communicate a serious expression of an intent to

> commit an act of unlawful violence to a particular individual or group of individuals. The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats "protect[s] individuals from the fear of violence" and "from the disruption that fear engenders," in addition to protecting people "from the possibility that the threatened violence will occur."

*Black*, 538 US at 359-60, 123 SCt at 1548, 155 LEd2d 535 (citing *Watts*, 394 US at 708, 89 SCt 1399, 1401-02, 22 LEd2d 664; R.A.V. v. City of St. Paul, 505 US 377, 388, 112 SCt 2538, 2546, 120 LEd2d 305 (1992)). The Eighth Circuit Court of Appeals has stated that "[t]he court must analyze an alleged threat 'in the light of [its] entire factual context' and decide whether the recipient of the alleged threat could reasonably conclude that it expresses 'a determination or intent to injure presently or in the future.'" United States v. Dinwiddie, 76 F3d 913, 925 (8thCir 1996) (citations omitted); *see also Pulaski*, 306 F3d at 621-22 (8thCir 2003) (en banc) (citations omitted) (reversing Doe v. Pulaski County Special Sch. Dist., 263 F3d 833 (8thCir 2001)).

[¶14.] In light of the facts and circumstances of this case, Austad's statements can be characterized as true threats. Austad not only made general threats regarding himself and others, he made specific threats regarding his parole officer. Austad identified the parole officer as "Mark K." and stated that he would "put two bullets in [the parole officer's] skull" in "assassination style." The recipients of Austad's statements, Gilchrist and Baum, considered them serious. They informed both DOC and parole staff. Their reactions to Austad's statements were influenced by their past interactions with Austad. Both knew of the gruesome contents of Austad's journal. Further, Baum knew that Austad had been disciplined numerous times.

[¶15.]     Austad argues that his statements were not true threats because he did not intend to harm his parole officer. Austad asserts that he merely intended to seek further institutional placement by presenting himself as mentally disturbed. Whether he intended to follow through with the threats, however, is irrelevant. *See Black*, 538 US at 359-60, 123 SCt at 1548, 155 LEd2d 535. In light of the facts of this case, a recipient of Austad's statements could "reasonably conclude" that he intended to injure his parole officer. *See Dinwiddie*, 76 F3d at 925.

[¶16.]     Therefore, we cannot agree with Austad's position that his statements were protected speech and therefore did not violate the terms of his supervision agreement. Austad asserts no other basis for his claim. The Board did not err when it determined that Austad violated the terms of the supervision agreement. Although the trial court did not engage in the true threat analysis, it determined that the Board presented sufficient evidence to prove that Austad violated the agreement. Because the result was correct, we affirm the trial court. Tovsland v. Reub, 2004 SD 93, ¶20, 686 NW2d 392, 400; *see also* Poindexter v. Hand County Bd. of Equalization, 1997 SD 71, ¶16, 565 NW2d 86, 91 ("Where a judgment is correct, this court will not reverse although it was based on incorrect reasons or erroneous conclusions.").

*Equal Protection*

[¶17.]     Next, Austad argues that the Board violated his constitutional right of equal protection under the laws when it considered his conduct a violation of his supervision agreement. According to Austad, other inmates who had a portion of their sentence suspended, but who have not signed supervision agreements, would

not be subject to revocation of their suspended sentences for violations of institutional rules.  Therefore, Austad argues that he was treated differently from similarly situated inmates.

[¶18.]        The Fourteenth Amendment to the United States Constitution and Article VI, Section 18 of the South Dakota Constitution guarantee equal protection of the laws to all persons.  Equal protection "requires that the government 'treat similarly situated people alike,' a protection that applies to prison inmates." Murphy v. Miss. Dept. of Corr., 372 F3d 979, 984 (8thCir 2004) (citations omitted). For an equal protection claim, an inmate must prove that he was treated differently from a similarly situated class of inmates, that such treatment burdens one of his fundamental rights, and that the different treatment bears no rational relation to any legitimate penal interest.  *Id.*

[¶19.]        In this case, Austad failed to meet the first prong—he failed to prove that he was treated differently from a similarly situated class of inmates.  If we consider a narrow group of similarly situated inmates—those who have signed supervision agreements and are awaiting release on suspended sentence terms—we cannot find an equal protection violation.  The record is devoid of any evidence indicating that such inmates would not be subject to revocation of their suspended sentences if they violated the terms of their supervision agreements.

[¶20.]        Even if we consider a larger group of inmates, as asserted by Austad, we cannot find that Austad was treated differently from those inmates serving sentences which include a suspended term.  Austad relies solely on the testimony of Ed Ligtenburg (Ligtenburg), the director of parole services, to support his claim.

-10-

Ligtenburg stated that an inmate's suspended sentence would not normally be revoked for a violation of DOC rules if an inmate had not signed a suspended sentence supervision agreement. Ligtenburg testified as follows:

> Q (by Austad's attorney): If someone has not signed a suspended sentence supervision agreement, and they violate DOC rules, do you go and impose their suspended sentence violation?
> A: No, we would not normally do that.
> Q: They would just be punished by DOC rules and regulations; correct?
> A: That's correct.

Ligtenburg's testimony, however, establishes only that revocation "would not normally" occur under such circumstances. It does not establish specific evidence that another inmate with a suspended term was *not* subject to revocation for violation of institutional rules. Austad has failed to present sufficient evidence of an equal protection violation.

[¶21.] Further, our cases indicate that an inmate serving a sentence of which a term has been suspended may indeed be subject to revocation of that sentence, even if the inmate has not signed a supervision agreement. *See, e.g.*, Grajczyk v. S.D. Bd. of Pardons & Paroles, 1999 SD 149, 603 NW2d 508; Smith v. Bd. of Pardons & Paroles, 515 NW2d 219 (SD 1994); *In re* Schmit, 360 NW2d 513 (SD 1985); State v. Holter, 340 NW2d 691 (SD 1983). We have established "'that once the court has committed a defendant to the executive branch of the government, namely the penitentiary, that inmate then can be released only by and, under the supervision of the Board of Charities and Corrections, even though the release results from an order of suspension.'" *Grajczyk*, 1999 SD 149, ¶7, 603 NW2d at 511 (quoting State v. Huftile, 367 NW2d 193, 197 (SD 1985)). Therefore, only the Board

can revoke a suspended sentence before it commences. *Id.*; *see also Smith*, 515 NW2d at 222. In *Grajczyk*, we reaffirmed "[t]he strong public policy" which validates the breadth of discretion possessed by the Board:

> [I]f a person convicted of a crime and granted a period of probation or suspension as part of the sentence should commit offenses of such nature as to demonstrate to [the Board] that he is unworthy of the suspension, [the Board] has the power to revoke or change the suspension, both during the time of the suspended sentence and *before the suspended portion begins*.

1999 SD 149, ¶9, 603 NW2d at 511 (quoting *Holter*, 340 NW2d at 693) (emphasis added). Therefore, the Board can revoke a suspended sentence—even if an inmate has *not* signed a supervision agreement—as long as it determines that the inmate's offenses demonstrate the inmate is unworthy of suspension. It logically follows that the Board can revoke a suspended sentence after the inmate signs a supervision agreement but before release. In light of this principle and the lack of evidence in the record, Austad's equal protection claim is without merit.

*Reasonableness of Conditions*

[¶22.] Austad claims that Conditions 12 and 14 of his supervision agreement were not reasonable. We have recognized that "the Board of Pardons and Paroles may impose conditions on a defendant's suspended sentence in addition to those imposed by the sentencing court so long as the additional conditions are reasonable and not inconsistent with those mandated by the court." *Smith*, 515 NW2d at 224. According to Austad, Condition 12 was not a condition at all and is therefore unreasonable. Austad further argues that Conditions 12 and 14 were unreasonable because violating DOC rules subjected Austad to revocation of his suspended sentence. Austad does not argue that the conditions are inconsistent with any

condition imposed by the sentencing court. Rather, Austad simply argues that the conditions are unfair.

[¶23.] Austad claims that Condition 12 of the agreement is unreasonable because it does not set forth a condition of release. Condition 12 clarifies that even though Austad has signed his supervision agreement, he is still bound by the institutional rules of the Penitentiary. In its entirety, Condition 12 states, "I understand that violation of any institutional rule before my actual release from the institution may be considered a violation of my supervision agreement." Austad points out that unlike the other conditions that begin with the phrase "I will" followed by a directive, Condition 12 begins with the phrase "I understand." Therefore, Austad asserts that Condition 12 only requires Austad to "understand" something; it is not actually a condition and is therefore unreasonable.

[¶24.] We disagree. The preface of the conditions states that "[i]n consideration of Parole and/or Suspended Sentence/Supervision being granted me, I agree to the following." The plain language of the preface, considered in combination with the language of Condition 12, clarifies that subsequent to signing the supervision agreement and prior to release, Austad was still bound by institutional rules and any violation thereof could be considered a violation of the agreement. Condition 12 provided notice to Austad of that contingency, and the phrase "I understand" does not operate to remove it as a condition of the agreement.

[¶25.] We also disagree that Conditions 12 and 14 are unreasonable. As we established above, the Board maintains discretion to revoke an inmate's suspended sentence if the inmate commits offenses that demonstrate he is unworthy of the

suspension. Conditions which subject inmates to institutional rules and preclude threats of violence promote the legitimate penological objectives of deterring crime, rehabilitating prisoners, and promoting institutional security. Austad does not argue that the conditions are in any way inconsistent with the conditions imposed by the sentencing court.

*Decision of Board*

[¶26.] Finally, Austad argues that the Board's decision to revoke his suspended sentence was clearly erroneous. While Austad frames the issue as being subject to the clearly erroneous standard of review, he admitted at oral argument that the "reasonably satisfied" standard applies to the Board's revocation of a suspended term. After a review of the record, we find that the standard was met.

[¶27.] The transcript of the violation hearing before the Board contains testimony by Baum and Gilchrist, the mental health professionals present when Austad made the statements at issue. Gilchrist stated,

> [I]n my discussion with [Austad], I was trying to decide if in fact, you know, [the threats contained in his letter] were genuine or if they were not. And so I then asked the questions that you see in [the informational report]. And one of the questions that was asked in reference to him hurting people. You know, if you don't get into [the Human Services Center] and you're on the street, what might happen? And his quote was, If I get on the street, you better hope I don't pick up a gun, end quote. Upon further questioning, he indicated he would kill others and then kill himself. And I told him, well, you have choices, and to that he said, quote, The only choices are to be institutionalized or dead. And then Austad further stated killing people gives power Satan—gives power to Satan. And then I further asked if he ever saw himself coming back to prison and he said, quote, If I ever come back here, I will be on death row, end quote. Some more discussion followed that, and as the session was ending, we had talked to him about his parole agent and he indicated that his parole agent was Mark. He didn't know the last name. It

started with a K. He said that, quote, If I go to his office, I will put two bullets in his skull, end quote. When further questioned about that statement he said, quote, It will be assassination style, end quote.

The report filed by Gilchrist, also part of the record before us, mirrored his testimony regarding Austad's statements. Further, Baum testified:

[W]e called Mr. Austad into the office to clarify some things with the [letter]. . and to see just—if there was a level of threat. And he did make statements . . . . Just about his parole officer and that if he happened to get ahold of a gun, if he was released that people may be in danger, so we followed up with that and became a little more specific, and he said he'd, you know, go to his parole officer's office and—with the gun and shoot two bullets into his skull.

[¶28.] The evidence in the record, therefore, supports the Board's conclusion that Austad's threatening behavior violated the conditions of his supervision agreement. Austad cannot and does not point to any evidence leading to a contradictory conclusion. Austad argues, however, that he was not actually threatening to kill his parole officer. Instead, he argues he was attempting to present himself as mentally disturbed so as to obtain a mental health placement at the Human Services Center (HSC), rather than being released to the suspended term of his sentence. In support of his argument, Austad points to the testimony of Dr. Robert Strayhan (Strayhan), a psychiatrist who evaluated Austad. Strayhan testified that because Austad had not met his parole officer, his statement did not "present [ ] a direct threat so much as . . . an attempt to manipulate the environment to show people that he was ill enough and needed to be at HSC."

[¶29.] Austad's argument lacks merit. By itself, Strayhan's opinion merely suggests that Austad did not intend to actually threaten anyone. The other

evidence in the record, however, supports a contrary conclusion. First, the record contains Austad's eight-page letter/journal which graphically describes brutally assaulting and raping unnamed victims. Second, Strayhan admitted that "it may be on the surface that [the letter] was something that was written without any true intent, but it may be also something that would indicate [Austad] has certain fantasies that he has not heretofore spoken to that may present a risk." Strayhan could not "make a definitive conclusion without further evaluation." Strayhan's opinion was that Austad needed further treatment, which according to a psychometric algorithm and supporting literature, "would be treatment that included—that occurred while the individual was incarcerated." Finally, Baum testified that while incarcerated, Austad made numerous threats to staff and officers.

[¶30.] Because there is adequate evidence to support the Board's decision, we cannot find that the Board abused its discretion in revoking Austad's suspended sentence. Affirmed.

[¶31.] GILBERTSON, Chief Justice, and SABERS, KONENKAMP, and ZINTER, Justices, concur.