557 N.W.2d 235 (1996)
1996 SD 144
D. G., Plaintiff and Appellant,
v.
D. M. K., a/k/a D. M., Defendant and Appellant.
Nos. 19462, 19550.
Supreme Court of South Dakota.
Argued October 24, 1966.
Decided December 31, 1996.
Rehearing Denied February 6, 1997.
*236 Kenneth E. Jasper, Rapid City, for plaintiff and appellant D.G.
Debra D. Watson of Watson Law Office, Rapid City, for defendant and appellant D.M.K.
Larry Plank, Black Hills Legal Services, Rapid City, for appellee C.K., minor child.
MILLER, Chief Justice.
[¶ 1] In this action the trial court, on motion of Mother's former boyfriend, adopted the "equitable parent doctrine" and found boyfriend to be the "legal" father of Mother's child. The judge placed physical custody of the child with Mother and gave visitation to the equitable father. Both parties appeal. We affirm in part, reverse in part, and remand.

FACTS AND PROCEDURAL HISTORY
[¶ 2] Mother met boyfriend (D.G.) either in October 1990 or in February 1991.[1] They eventually began living together at D.G.'s residence in Rapid City, South Dakota, but never married. On August 6, 1991, Mother gave birth to a daughter, C.M. (Child). D.G. was present for the birth and helped Mother choose a name for the child. No father was listed on Child's birth certificate. She was given Mother's surname.
[¶ 3] Following Child's birth, Mother and D.G. continued to live together for approximately seven months. During this time, D.G. financially supported Mother and Child, as well as providing assistance for Mother's *237 two teenage sons from a previous marriage. In March of 1992, Mother and D.G.'s relationship began to deteriorate. Mother and Child moved to an apartment in Rapid City. They then moved to a trailer home owned by D.G. in nearby Black Hawk, before moving to another apartment in Rapid City. During this time, D.G. had sporadic contact with Child and provided some financial support to Mother.
[¶ 4] Mother and D.G.'s relationship further deteriorated over the next several months. Mother ultimately filed for a protection order against D.G. alleging, among other things, that he was not Child's biological father. The circuit court entered its protection order on March 17, 1993, and ordered no visitation between D.G. and Child. The basis for the circuit court's refusal of visitation was that D.G. had made no showing of paternity.
[¶ 5] D.G. commenced a paternity action on March 23, 1993. Blood test results conclusively determined he was not Child's biological father. Following the test results, D.G. acknowledged he was not Child's biological father and agreed to dismiss the paternity action. The circuit court, the Honorable Merton B. Tice presiding, dismissed D.G.'s paternity action "with prejudice and on its merits" as agreed by the parties.
[¶ 6] In April of 1993, Mother moved with Child to Missouri. Mother struggled financially, at times having to live out of her car. After four months, she asked D.G. to care for Child while she settled in Missouri. He agreed and sent money to pay for Child's return to South Dakota. Mother brought Child to D.G. in October. She left telephone numbers and addresses where she could be reached and told D.G. she would return in two or three weeks.
[¶ 7] Mother was unable to secure employment in Missouri as quickly as planned. By November, she still had not found employment or a place to live.[2] On December 16, 1993, Mother signed a paternity affidavit listing D.G. as Child's father. D.G. also signed the affidavit and forwarded it to the State of South Dakota for issuance of a new birth certificate for Child. Mother contends she signed the affidavit solely to give D.G. a power of attorney to get medical attention for Child, should the need arise. The amended birth certificate listed D.G. as Child's father and listed Child's surname as his. Both parties acknowledge the amended birth certificate was signed and issued after the blood test results revealed D.G. was not Child's biological father.
[¶ 8] Child remained with D.G. for the next year. Mother occasionally sent letters and telephoned.[3] During this time, Mother met and married M.M. She obtained her commercial driver's license and drove truck with her new husband. This work required Mother to travel extensively and made contacting her difficult.
[¶ 9] In September of 1994, Mother traveled to Rapid City, South Dakota, to pick up Child. She returned to Missouri because she was unable to locate D.G. or Child while in Rapid City. She again returned to Rapid City on October 14, 1994. Despite the assistance of law enforcement, who accompanied Mother to D.G.'s residence, she was again unable to locate D.G. or her daughter. She returned to Missouri.
[¶ 10] On October 19, 1994, D.G. commenced a second paternity action requesting that he be declared Child's father and further that he be awarded custody of Child. Mother answered the complaint denying D.G. was the father of Child and alleging that Judge Tice's order dismissing the original paternity action with prejudice barred D.G.'s second action as res judicata.
[¶ 11] Mother filed a motion for return of custody and a hearing was scheduled for February 9, 1995. She failed to attend the hearing.[4] Following the hearing, the trial court, the Honorable Roland E. Grosshans presiding, entered an interim order directing the Department of Social Services (DSS) to *238 conduct an investigation and home study of both parties. The trial court continued physical custody with D.G. and granted Mother supervised visitation.
[¶ 12] On February 10, 1995, Mother returned to Rapid City. She secured employment in the area and resided in Rapid City throughout the custody proceedings. On March 10, 1995, after a preliminary investigation and allegations of sexual abuse against D.G.,[5] the trial court placed legal custody of Child with DSS and physical custody of Child with Mother. D.G. was allowed visitation in the discretion of DSS. A "no contact" and mutual protection order between Mother and D.G. was also entered.
[¶ 13] On April 11, 1995, a hearing was held on Mother's motion to dismiss. During this hearing, the court noted Mother's inability to pay her legal fees associated with contesting D.G.'s paternity action. Sua sponte, the trial court appointed Mother's attorney at county expense. The court found the appointment was necessary to ensure the court would receive all relevant information to determine the best interest of Child. A guardian ad litem and an attorney were appointed for Child on June 19, 1995.
[¶ 14] Numerous experts testified at trial.[6] Through the various investigations, home studies and evaluations, several concerns about the prospective parents were presented to the court.
[¶ 15] D.G. has had several encounters with law enforcement.[7] In 1987, he was convicted of felony sexual contact with a minor and served six years in the state penitentiary. Several years earlier, in 1973, D.G. had been in a serious automobile accident, resulting in a closed head injury with frontal lobe damage. He currently suffers from frontal lobe syndrome, a condition which causes him to have difficulties with impulsive behavior and lack of foresight and planning. D.G. has been able to compensate for these deficits through medication, organic healing of the wound and the support of his wife, M.L. who is a registered oncology nurse.[8] M.L. served as a surrogate mother to Child while the child lived with D.G.
[¶ 16] Mother has a history of unreliability, often embellishing or fabricating stories to accomplish the immediate task at hand. Virtually nothing is known about her husband, M.M., other than he is currently on probation for a sexual assault conviction. Child has never met M.M. or interacted with his six-year-old son. During a home study and evaluation, Mother was observed to use appropriate parenting skills and appeared to have redeveloped a close emotional bond with her daughter.
[¶ 17] Child suffers from great anxiety and a fear of separation from both D.G. and Mother. She denies being sexually abused, but drawings done by her as part of an evaluation indicated "red flag" warnings she had been exposed to a traumatizing event of a sexual nature.[9] Child has developed a bond with D.G. and has successfully reestablished her relationship with Mother.
[¶ 18] The experts varied in their recommendations concerning the permanent placement of Child.[10] However, all agreed if *239 placement was not with Mother, the child's close relationship with D.G. made him an appropriate alternative.
[¶ 19] Following a court trial, D.G. was determined to be Child's legal father under the equitable parent doctrine. The trial court found it to be in the best interest of Child to place physical custody with Mother. D.G. was granted visitation and ordered to pay child support. Both parties appeal the decision.

[¶ 20] I. Whether the trial court had the authority to appoint counsel for an indigent mother in a paternity action.
[¶ 21] On appeal, D.G. contends the circuit court was without authority to appoint counsel for Mother at Pennington County expense.[11] D.G. contends the appointment of counsel for Mother was improper and placed the parties on unequal footing in the proceedings because he was required to pay for his counsel while she was not. We conclude that D.G. lacks standing to raise this issue.
[¶ 22] As we recently explained in Agar School District No. 58-1 Board of Education v. McGee, 527 N.W.2d 282, 284 (S.D. 1995):
"Standing is established through being a `real party in interest' and it is statutorily controlled." Wang v. Wang, 393 N.W.2d 771, 775 (S.D.1986). Under SDCL 15-6-17(a), "[e]very action shall be prosecuted in the name of the real party in interest." The real party in interest requirement for standing is satisfied if the litigant can show "`that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the Defendant.'" Parsons v. South Dakota Lottery Commission, 504 N.W.2d 593, 595 (S.D. 1993) (quoting Gladstone, Realtors v. Bellwood, 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66, 76 (1979)).
Standing is determined by the status of the party seeking relief, not the issues presented. In re Matter of Baby Boy K., 1996 SD 33, ¶ 14, 546 N.W.2d 86, 90. "We do not consider whether the party filing the challenge `will ultimately be entitled to any relief but whether he has the legal right to seek judicial redress for his grievance.'" Id. (quoting In re Adoption of Baby Boy D., 742 P.2d 1059, 1062 (Okla.1985), cert. denied, 484 U.S. 1072, 108 S.Ct. 1042, 98 L.Ed.2d 1005 (1988)).
[¶ 23] D.G. has not challenged the appointment of Mother's counsel as a taxpayer of Pennington County.[12] His sole challenge is that the appointment placed the parties on unequal footing because he was required to provide counsel at his expense while Mother enjoyed the benefit of counsel at county expense. D.G. has not shown he suffered any actual or threatened harm as a result of the appointment. Regardless of the manner in which Mother was represented during the proceedings, D.G., in instituting this action, would have expended funds. He has not alleged the court-appointed counsel caused him to incur unnecessary legal expenses or in any manner increased his legal costs. Absent a threatened or actual injury, D.G. is without standing to challenge the authority of the trial court to appoint counsel for Mother at county expense.

[¶ 24] II. Whether the earlier order dismissing D.G.'s paternity action with prejudice made the issue of biological fatherhood res judicata.
[¶ 25] The blood test results performed in conjunction with D.G.'s original paternity action *240 established he was not Child's biological father. At that time, D.G. agreed to dismiss his paternity action based on the blood test results. As noted earlier, an order was entered by Judge Tice dismissing the action "with prejudice and on its merits."
[¶ 26] In this subsequent action, Judge Grosshans found the issue of whether D.G. was Child's biological father was res judicata based on the previous order. D.G. contends the issue is not res judicata because Judge Tice did not take evidence or conduct a hearing, but rather based the dismissal on the agreement of the parties and an unrecorded meeting in chambers.
[¶ 27] The doctrine of res judicata is well established.
Res judicata bars an attempt to relitigate a prior determined cause of action by the parties or one of the parties in privity to a party in the earlier suit. Du-Al Mfg. Co. v. Sioux Falls Const. Co., 487 N.W.2d 29 (S.D.1992); Melbourn v. Benham, 292 N.W.2d 335 (S.D.1980). This Court applies four factors in determining if this doctrine applies: (1) was the issue decided in the former adjudication identical to the present issue; (2) was there a final judgment on the merits; (3) are the parties in the two actions the same or in privity; and (4) was there a full and fair opportunity to litigate the issues in the prior adjudication? Moe v. Moe, 496 N.W.2d 593, 595 (S.D. 1993); Raschke v. DeGraff, 81 S.D. 291, 295, 134 N.W.2d 294, 296 (1965).
Wintersteen v. Benning, 513 N.W.2d 920, 921 (S.D.1994).
[¶ 28] "The test for determining if both causes of action are the same is a query into whether the wrong sought to be redressed is the same in both actions." Du-Al Mfg. Co., 487 N.W.2d at 31. Certainly, both paternity actions raised the precise issue, i.e., paternity.
[¶ 29] The original paternity action was dismissed by order of the circuit court "with prejudice and on its merits." The only record evidence on the matter is a letter to the court from D.G.'s counsel agreeing to the order of dismissal. D.G. contends the absence of evidence and a hearing before Judge Tice precluded the possibility of the court determining the issue on the merits. Absent a complete record, in this case the lack of a transcript[13] of the discussion surrounding the dismissal of the paternity action, we presume the circuit court acted properly. Baltodano v. North Cent. Health Services, Inc., 508 N.W.2d 892, 895 (S.D.1993). An appellant must overcome this strong presumption in favor of the circuit court's decision in the absence of an adequate record. Owens v. Moyes, 530 N.W.2d 663, 665 (S.D.1995). Judge Tice's order of dismissal states the action was "dismissed with prejudice and on its merits." D.G.'s letter to the court does not object to the order. Without a showing to the contrary, we must presume Judge Tice considered the merits before dismissing D.G.'s action in accordance with the evidence and agreement of the parties.
[¶ 30] Thus, Judge Grosshans correctly applied the principle of res judicata.

[¶ 31] III. Whether D.G. is the legal father of Child under the equitable parent doctrine.
[¶ 32] The facts and circumstances surrounding this case present us with a case of first impression: Does the equitable parent doctrine exist in South Dakota and, if so, does it apply in this case? We have previously addressed corollaries of this issue, see Crouse v. Crouse, 1996 SD 95, ¶¶ 13-16, 552 N.W.2d 413, 416-17 (holding paternity by estoppel not applicable when husband knew he was not the child's biological father); E.H. v. M.H., 512 N.W.2d 148, 151 (S.D.1994) (holding a stepparent has no duty to provide child support for stepchildren after divorce), but for the first time are asked to specifically adopt the equitable parent doctrine. Under *241 these facts and circumstances, we decline to do so.
[¶ 33] Relying on the holding of Atkinson v. Atkinson, 160 Mich.App. 601, 608, 408 N.W.2d 516, 519 (1987), the trial court found D.G. to be Child's father by virtue of the equitable parent doctrine.[14] In Atkinson, the wife denied her husband was the biological father of a child born during the marriage. This allegation was confirmed by blood test results indicating the husband was not the child's father. The Michigan Court of Appeals, in adopting the equitable parent doctrine, held
a husband who is not the biological father of a child born or conceived during the marriage may be considered the natural father of that child where (1) the husband and the child mutually acknowledge a relationship as father and child, or the mother of the child has cooperated in the development of such a relationship over a period of time prior to the filing of the complaint for divorce, (2) the husband desires to have the rights afforded to a parent, and (3) the husband is willing to take on the responsibility of paying child support.
Atkinson, 160 Mich.App. at 608, 408 N.W.2d at 519.
[¶ 34] In applying the Atkinson factors to this case, the trial court removed the marriage requirement. The court concluded that requiring the parties to be married as an element of the equitable parent doctrine "would be to view the legal issue from the perspective of the parent rather than the perspective of the child. Furthermore, such a view would deny a minor child the right of a supporting parent solely because of her illegitimate birth, a situation beyond the child's control." The trial court thus determined D.G. to be Child's equitable father under the remaining Atkinson factors.
[¶ 35] For a number of reasons, the trial court incorrectly relied on the equitable parent doctrine in this case. First, the Atkinson decision is distinguishable. Unlike the Michigan case law relied on for the result in Atkinson, South Dakota case law recognizes a stepparent cannot be considered a natural parent against the stepparent's will and cannot be forced to provide child support for minor stepchildren after the divorce. E.H., 512 N.W.2d at 151. Our law does not treat a stepparent as a natural parent. See Crouse, 1996 SD 95 at ¶ 16, 552 N.W.2d at 417; E.H., 512 N.W.2d at 151. Unlike the case law relied on in Atkinson, a stepparent is not entitled to custody or visitation rights in South Dakota. Cf. Quinn v. Mouw-Quinn, 1996 SD 103, ¶ 13, 552 N.W.2d 843, 846 (finding extraordinary circumstances of the case justified visitation privileges for stepparent when stepchild's half-siblings were granted visitation with stepparent).
[¶ 36] Second, the equitable parent doctrine is based in equity. The elements considered in the application of the equitable parent doctrine are essentially the same as those that underlie an application of estoppel. In re Marriage of Gallagher, 539 N.W.2d 479, 482 (Iowa 1995) (citing Ex parte Presse, 554 So.2d 406, 411 (Ala.1989) (applying doctrine of collateral estoppel); In re Marriage of O'Brien, 13 Kan.App.2d 402, 772 P.2d 278, 283, aff'd in part and rev'd in part on other grounds, 245 Kan. 591, 783 P.2d 331 (1989) (wife estopped from denying paternity); Atkinson, 160 Mich.App. at 608, 408 N.W.2d at 519 (creating "equitable parent" doctrine); Boyles v. Boyles, 95 A.D.2d 95, 466 N.Y.S.2d 762, 765 (1983) (applying traditional theory of estoppel); Nelson v. Nelson, 10 Ohio App.3d 36, 460 N.E.2d 653, 654-55 (1983) (estopping wife from denying parentage to avoid "father-shopping" and the problem of staleness of evidence); Hodge and Hodge, 84 Or.App. 62, 733 P.2d 458, 459-60 (1987) (applying equitable estoppel); Adoption of Young, 469 *242 Pa. 141, 364 A.2d 1307, 1313 (1976) (invoking collateral estoppel); In re Paternity of D.L.H., 142 Wis.2d 606, 419 N.W.2d 283, 286-87 (1987) (invoking equitable estoppel)).
[¶ 37] Equitable estoppel is based on fair dealing, good faith and justice.
In order to constitute equitable estoppel, false representations or concealment of material facts must exist, the party to whom it was made must have been without knowledge of the real facts, the representations or concealment must have been made with the intention that it should be acted upon, and the party to whom it was made must have relied thereon to his prejudice or injury. There can be no estoppel if any of these essential elements are lacking, or if any of them have not been proved by clear and convincing evidence. Heupel v. Imprimis Technology, Inc., 473 N.W.2d 464, 466 (S.D.1991); L.R. Foy Const. v. South Dakota State Cement Plant Comm'n., 399 N.W.2d 340, 344 (S.D.1987); Taylor v. Tripp, 330 N.W.2d 542, 545 (S.D. 1983).
Century 21 Associated Realty v. Hoffman, 503 N.W.2d 861, 866 (S.D.1993). The presence of fraud, false representation or concealment of material facts is essential to equitable estoppel. Crouse, 1996 SD at ¶ 14, 552 N.W.2d at 417 (citing Valley Bank v. Dowdy, 337 N.W.2d 164 (S.D.1983); Taylor v. Tripp, 330 N.W.2d 542 (S.D.1983); Spitzer v. Spitzer, 84 S.D. 147, 168 N.W.2d 718 (1969); Cromwell v. Hosbrook, 81 S.D. 324, 134 N.W.2d 777 (1965)).
[¶ 38] Following the blood test results in the original paternity action, D.G. was aware he was not Child's biological father. Prior to Mother's move to Missouri, D.G. acknowledged he was not Child's biological father. With this admission, he cannot now contend he was without knowledge of the real facts surrounding Child's parentage. D.G. cannot profess a concealment or false representation by Mother that he was, in fact, Child's father or that he relied upon any false representation or concealment in agreeing to care for Child. The blood test results proved otherwise months before he agreed to care for the child. "To maintain estoppel, there must have been an act or conduct by the party to be estopped which induces reliance by another to his or her detriment, thus creating a condition that would make it inequitable to allow the guilty party to claim what would otherwise be his or her legal rights." E.H., 512 N.W.2d at 149-50 (emphasis omitted). Knowing he was not the biological father, D.G. could not detrimentally rely on any act by Mother to the contrary.
[¶ 39] Third, D.G. has no legal relationship to Child. He is not her biological father. He is not her adoptive father. He never petitioned for guardianship of Child. He never married Child's mother. Simply put, he is an interested third party who at one time lived with Mother and cared (be it ever so deeply) for Child. "When a man is neither the biological or adoptive father nor married to the mother, there is little authority that supports a claim of a right to visitation or custody." C.M. v. P.R., 420 Mass. 220, 649 N.E.2d 154, 156 (1995). See generally Alan Stephens, Annotation, Parental Rights of Man Who is Not Biological or Adoptive Father of Child but Was Husband or Cohabitant of Mother When Child Was Conceived or Born, 84 A.L.R.4th 655 (1991). Though D.G.'s intentions are admirable, his status gives him no legal basis for asserting custody. See In re Sedelmeier, 491 N.W.2d 86, 88-89 (S.D.1992); Cooper v. Merkel, 470 N.W.2d 253, 255-56 (S.D.1991).
[¶ 40] In In re Ash, 507 N.W.2d 400 (Iowa 1993), the Iowa Supreme Court was presented with a factual scenario similar to that of D.G. and Mother. Ash provided support and care for mother in the months prior to the birth of her child. He was not the child's biological father. After the birth of the child, Ash helped care for mother and the child and developed a close relationship with the child. Ash voluntarily provided child support after mother and the child stopped living with him. When mother married and moved from the state, Ash sought to gain visitation with the child. The court noted the absence of any legal basis for Ash's claim and stated, "[s]training to legitimize such an action under current law would foster a superfluity of claims by parties who shared a special relationship with children based neither *243 upon affinity or consanguinity." Ash, 507 N.W.2d at 404.
[¶ 41] In the instant case, the trial court rejected the Atkinson requirement that the parties need to have been married for the equitable parent doctrine to apply. We recognize married couples are no longer the exclusive forum for raising children. Social norms have evolved to create numerous situations in which children are nurtured and cared for outside the bounds of the traditional family. While the perspective of the child is paramount for determining the child's best interest, without the marriage requirement as a limit to the application of the equitable parent doctrine, the legal definition of parent is rendered meaningless.
"[E]xpanding the definition of a `parent' in the manner advocated by appellant could expose other natural parents to litigation brought by child-care providers of long standing, relatives, successive sets of step-parents or other close friends of the family. No matter how narrowly we might attempt to draft the definition, the fact remains that the status of individuals claiming to be parents would have to be litigated and resolution of these claims would turn on elusive factual determinations of the intent of the natural mother, the perceptions of the children, and the course of conduct of the party claiming parental status. By deferring to the legislature in matters involving complex social and policy ramifications far beyond the facts of the particular case, we are not telling the parties that the issues they raise are unworthy of legal recognition. To the contrary, we intend only to illustrate the limitations of the courts in fashioning a comprehensive solution to such a complex and socially significant issue."
Ash, 507 N.W.2d at 404 (quoting Nancy S. v. Michele G., 228 Cal.App.3d 831, 840, 279 Cal.Rptr. 212, 219 (1991)). We are not prepared to expand the definition of parent beyond that prescribed by our legislature. It is up to the legislature to decide whether the definition of parent should be modified.
[¶ 42] We do not question D.G.'s love for Child. We acknowledge his noble intentions in providing a home for her. However, he is without a legal basis to assert any parental rights concerning Child. The trial court's adoption of the equitable parent doctrine and the award of parental rights to D.G. is reversed.
[¶ 43] Our rejection of the equitable parent doctrine makes moot the issues of whether an equitable parent is equal to a natural parent for purposes of awarding custody and whether the trial court abused its discretion in awarding custody to Mother. We turn now to the remaining issue in this appeal.

[¶ 44] IV. Whether the trial court abused its discretion in awarding D.G. visitation.
[¶ 45] After determining D.G. to be Child's legal father, the trial court awarded custody of Child to mother and granted D.G. visitation with the child. We have reversed the trial court's determination D.G. is Child's legal father.
[¶ 46] The right to visitation is derived from the right to custody. Sedelmeier, 491 N.W.2d at 89; Cooper v. Merkel, 470 N.W.2d 253, 255-56 (S.D.1991).
[I]n order to grant a nonparent visitation rights with a minor child over the wishes of a parent, a clear showing against the parent of gross misconduct, unfitness or other extraordinary circumstances affecting the welfare of the child is required.
Cooper, 470 N.W.2d at 255-56 (emphasis supplied). "Extraordinary circumstances" denotes more than a simple showing that visitation would be in the child's best interest. Quinn, 1996 SD 103 at ¶ 13, 552 N.W.2d at 846 (citing Sedelmeier, 491 N.W.2d at 88).
[¶ 47] We remand the issue of visitation to the trial court for an evidentiary hearing to determine whether extraordinary circumstances exist which would permit visitation for D.G.
[¶ 48] We affirm the trial court's appointment of Mother's counsel and determination that the issue of fatherhood was res judicata, reverse the trial court's adoption of the equitable parent doctrine, and remand the issue of visitation for proceedings consistent with this opinion.
*244 [¶ 49] SABERS, AMUNDSON, and GILBERTSON, JJ., and TUCKER, Circuit Judge, concur.
[¶ 50] TUCKER, Circuit Judge, sitting for KONENKAMP, J., disqualified.
NOTES
[1] The parties dispute when they first met. D.G. contends he met Mother in October, 1990. Mother contends they met on Valentine's Day, February 14, 1991. The trial court made no specific finding concerning the date the couple first met.
[2] Mother originally indicated she would return for Child by November 8, 1993.
[3] All letters sent by Mother were addressed to Child using D.G.'s surname.
[4] Mother stated she was driving truck out of state at the time the hearing was held.
[5] Further investigation failed to substantiate the claims of sexual abuse.
[6] The trial court observed "[s]eldom in my experience have there been so many experts assembled to analyze the circumstances surrounding one child's future."
[7] In 1976, D.G. was convicted of third-degree burglary. He was convicted of obstructing justice in violation of his probation in 1979, and he committed his third driving under the influence offense in 1986. D.G. violated his parole and was charged with obstructing justice in 1990.
[8] M.L. has been under treatment for depression since January, 1993. She is currently taking anti-depressants.
[9] No specific act of sexual abuse was identified and the experts opined the traumatizing sexual abuse could have occurred any time during the child's life and could stem from a number of inappropriate sexual activities. Expert testimony indicated coaching by Mother may also have contributed to the drawings.
[10] The experts noted the lack of sufficient time they had to observe the parties and make a specific recommendation to the court concerning custody. DSS recommended continuing custody with DSS so the situation could be monitored when Mother and Child returned to Missouri.
[11] Pennington County filed an appeal of the circuit court's appointment of counsel for Mother. It subsequently withdrew its appeal and is no longer a party to this appeal.
[12] Taxpayer actions require formalities not followed by D.G. in challenging the appointment of Mother's counsel at county expense. SDCL 7-8-28 sets forth the procedure for a general taxpayers' challenge to county commission decisions and provides, in relevant part:

Upon written demand of at least fifteen taxpayers of the county, the state's attorney shall take an appeal from any action of such board if such action relates to the interests or affairs of the county at large or any portion thereof, in the name of the county, if he deems it to the interest of the county to do so....
See also Weger v. Pennington County, 534 N.W.2d 854, 857 (S.D.1995). A taxpayer may directly appeal the decision of the board of county commissioners to the circuit court upon filing a bond. SDCL 7-8-27. D.G. concedes he has not complied with these procedures and is not contesting the payment as a taxpayer.
[13] D.G.'s briefs repeatedly contend Mother bears the burden of providing a transcript of the proceedings concerning the dismissal of D.G.'s original paternity claim. This is an incorrect statement of Mother's burden on appeal. As the appellant on this issue, D.G. has the burden of providing this Court with an adequate record for review, including a transcript, if necessary. Owens v. Moyes, 530 N.W.2d 663, 665 (S.D.1995).
[14] The trial court's written opinion refers to the factors analyzed as elements of equitable adoption. However, the factors cited and the language of Atkinson referred to by the trial court specifically deal with the doctrine of equitable parent. The trial court analyzed the facts and circumstances of this case in light of the equitable parent doctrine and appears to have interchangeably referred to the doctrine as that of equitable adoption. Under the doctrine of equitable adoption, an implied contract to adopt is found when a close relationship, similar to parent-child, between the child and nonparent exists. Wright v. Wright, 99 Mich. 170, 58 N.W. 54 (1894); Steward v. Richardson, 353 F.Supp. 822, 825 (E.D.Mich.1972).