COURT OF APPEALS


EIGHTH DISTRICT OF TEXAS


EL PASO, TEXAS



)
 

 )
 No. 08-02-00082-CV

IN THE INTEREST OF )


)
 Appeal from

REGAN NICOLE SHOCKLEY,
)
 

)
 318th District Court

 A MINOR CHILD.
)


)
 of Midland County, Texas

)


)
 (TC# FM-36,251)


O P I N I O N



 We address today the legal complexities and competing public policies which arise between
a biological father and a psychological daddy. Monica Smith, the mother of Regan Shockley, and
Damin Guthrie, the biological father, appeal the trial court's order establishing a parent-child
relationship between Regan and Kevin Shockley and appointing Kevin as the sole managing
conservator. For the reasons that follow, we affirm the judgment of the trial court.

FACTUAL SUMMARY


 Although they never married, Kevin Shockley and Monica Smith engaged in a sexual
relationship between 1992 and mid-1996. In late May and early June 1996, Monica was sexually
intimate with both Kevin and with Damin Guthrie. Kevin was unaware of Monica's involvement
with Damin, but Damin knew about Kevin. Monica learned that she was pregnant in October 1996. 
Kevin asked her if there were any possibility that the child was not his, but Monica denied having
sexual relations with any other men. She never told anyone about her sexual liaison with Damin
until March 2001. Regan was born on February 24, 1997, in San Angelo. Kevin attended the birth
and signed the necessary documents to be named as the father on the birth certificate. Monica
acquiesced in Regan's surname being listed as Shockley. Damin recognized there was a possibility
that he was Regan's father and on more than one occasion, he confronted Monica. Damin even
asked for genetic testing, but Monica refused his request, persisting in her claim that Kevin was
Regan's father. Indeed, as the trial court specifically found, Monica intended for Kevin to assume
the rights and duties of fatherhood. (1)

 Kevin began paying child support soon after Regan was born and visited regularly. After
Regan was weaned from breast feeding, Kevin began keeping her one or two nights a week. In July
1998, Kevin married Misti Evans and moved to Midland. Kevin and Monica agreed that Regan
would alternate weeks between Midland and San Angelo. Between July 1998 and May 1999, Regan
split her time equally between Monica and Kevin. Because Misti was employed as a teacher and was
not working during the summer, Regan began to stay in Midland on a continuous basis. Once school
began, Misti returned to work and Regan started day care. From June 1999 until this lawsuit was
filed, Regan lived with Kevin and Misti in Midland on almost a continuous basis, with Monica
seeing Regan on a few occasional weekends. She began seeing her more often around the end of
November 1999.

 On February 8, 2000, Monica filed a paternity suit in San Angelo alleging Kevin to be
Regan's father. The very same day, Kevin filed suit in Midland alleging that he was Regan's
biological father and seeking sole managing conservatorship. Monica filed an answer in which she
admitted Kevin's paternity. On May 30, 2000, the court in San Angelo entered temporary orders
pursuant to which Kevin and Monica alternated weeks of possession. In June, Monica's lawsuit was
transferred to Midland and consolidated with Kevin's action. The visitation arrangements continued
with Kevin and Misti regularly delivering Regan to Monica and paying for the transportation costs. 
There were frequent occasions when Monica would call and ask that Kevin and Misti keep Regan
an extra week.

 On March 20, 2001, without Kevin's knowledge and without the benefit of a court order, 
Monica, Damin, and Regan obtained parentage testing. The results revealed Damin could not be
excluded as the biological father and a 99.8 percent probability (2) that Damin was the biological father. 
This disclosure marked the first time that Kevin became aware that he may not be Regan's father. 
On April 9, Damin filed a petition in intervention seeking to establish his parentage, to be named as
a joint managing conservator, to change Regan's surname to Guthrie, and to recover attorney's fees. 
On April 27, Monica amended her pleadings, alleging for the first time that Damin was Regan's
father and joining Damin as an additional respondent to the suit. On May 21, she again amended
her petition, requesting an order that would terminate or restrict Kevin's relationship with the child. 
In furtherance of this goal, Monica told four-year-old Regan that Kevin was not her father. On
May 30, Damin filed "Intervenor/Cross-Respondent's Original Answer," the contents of which we
recite verbatim:

 DAMIN LEE GUTHRIE, Intervenor/Cross-Respondent, files his Original Answer
to MONICA DELPHIA SMITH's Original Cross-Petition in Suit Affecting the
Parent-Child Relationship and shows:


 1. Affirmation

 Intervenor/Cross-Respondent affirms the pleadings of MONICA DELPHIA
SMITH and affirms that he is the biological father of the child REGAN NICOLE
SHOCKLEY.

 2. Prayer

 Intervenor/Cross-Respondent prays that the relief requested in MONICA
DELPHIA SMITH'S Original Cross-Petition in Suit Affecting the Parent-Child
Relationship be granted and that DAMIN LEE GUTHRIE be named as the biological
father of the child REGAN NICOLE SHOCKLEY, and that Respondent be granted
all relief requested in this Original Answer.


 Intervenor/Cross-Respondent prays for general relief.


In response to Kevin's motion for summary judgment based upon the statute of limitations, Damin
nonsuited his intervention. (3) The motion, filed on June 21, 2000, was granted by the court on
June 22. He filed no subsequent pleadings although he remained a respondent to Monica's lawsuit. 
 Following a bench trial before the Honorable Dean Rucker, the trial court adjudicated Kevin
as Regan's father and appointed him as the sole managing conservator. In response to Monica's
request for findings of fact and conclusions of law, Judge Rucker found that Kevin is the only father
Regan has ever known; that Damin had nonsuited his intervention; that Monica should be estopped
from denying Kevin's paternity and from seeking an adjudication that Damin is the child's biological
father; that it was impossible for Monica and Kevin to share parental rights and duties; and that it
was not in Regan's best interest for Monica and Kevin to be appointed joint managing conservators. 
Neither Monica nor Damin requested additional or amended findings and both have appealed.

STANDING


 Damin has appealed the judgment, complaining that he was not designated as the biological
father of Regan, which he clearly is. We inquired at oral argument whether he has standing to appeal
inasmuch as he nonsuited his intervention prior to trial and the judgment at issue does not impose
any obligations upon him whatsoever. Damin responded that despite the nonsuit, he sought
affirmative relief in his original answer and having been denied the relief sought, he has standing to
appeal. We disagree for the reasons that follow.

 First, the nonsuit was filed after the original answer and thus was the last pleading Damin
filed. The intervention sought a finding of parentage, appointment as a joint managing conservator,
a name change for Regan, and attorney's fees. The answer asked that Monica be granted the relief
she sought and that he be named as Regan's biological father. This is the same relief he sought in
his intervention and the very cause of action he nonsuited. 

 Standing focuses on whether the plaintiff has a sufficient personal stake in a controversy. 
See Nootsie, Ltd. v. Williamson County Appraisal District, 925 S.W.2d 659, 661 (Tex. 1996). The
issue of standing is purely a question of law for the court to determine. See Cleaver v. George Staton
Co., 908 S.W.2d 468, 472 (Tex.App.--Tyler 1995, writ denied). Rule 162 addresses the right of a
litigant to dismiss a case or take a nonsuit. Tex.R.Civ.P. 162. In most instances, the party taking
a nonsuit is the plaintiff, but a defendant may nonsuit any counterclaims. Similarly, Rule 162 applies
to intervenors. Strawder v. Thomas, 846 S.W.2d 51, 59 (Tex.App.--Corpus Christi 1992, no writ);
Boswell, O'Toole, Davis & Pickering v. Townsend, 546 S.W.2d 380, 381 (Tex.Civ.App.--Beaumont
1977, no writ). Not all counterclaims are claims for affirmative relief under Rule 162. Michol
O'Connor, O'connor's Texas Rules * Civil Trials 2002, Commentaries § 5.3 at 480 (2002). To
qualify as a claim for affirmative relief, a pleading must allege a cause of action on which a party
could recover, independent of the plaintiff's claim. Id., citing General Land Office v. OXY U.S.A.,
Inc., 789 S.W.2d 569, 570 (Tex. 1990). A claim that simply mirrors the controlling issues is not a
claim for affirmative relief. O'Connor, at 480, citing In re Estate of Kidd, 812 S.W.2d 356, 359
(Tex.App.--Amarillo 1991, writ denied). In our view, Damin's original answer did no more than
echo Monica's claims and reassert the fundamental claim contained within his intervention--designation as Regan's biological father. The nonsuit operated to abandon his claims for relief, all
of which related to the establishment of parentage. In his letter ruling to counsel announcing his
decision, Judge Rucker specifically found that Damin had abandoned his requests for affirmative
relief:

 Monica is the only party with a petition seeking to have Damin adjudicated as
Regan's father. Damin initially filed an intervention seeking to be adjudicated as the
biological father of the child. However, he filed a notice of nonsuit that was granted
by the Court on June 22, 2001. Monica is the only party affirmatively seeking to
have Damin adjudicated as Regan's biological father. . . . Damin, having sought and
obtained a nonsuit on his request for affirmative relief, has no independent claim to
establish parentage. 


The day after the letter ruling issued, Damin's counsel filed of record a letter he had earlier written
to the judge in which he acknowledged that Damin's "suit for affirmative relief was filed after the
two-year statutory limitations provided for by section 160.110(f) of the Texas Family Code" and that
Damin was, in effect, in agreement with the relief Monica sought.

 We recognize that letter rulings do not constitute formal findings of fact. Cherokee Water
Co. v. Gregg County Appraisal Dist., 801 S.W.2d 872, 878 (Tex. 1990); Hanif v. Alexander Oil Co.,
2002 WL 31087247 at *2 (Tex.App.--Houston [1st Dist.] September 19, 2002)(not designated for
publication). In his formal findings, Judge Rucker reiterated that Damin had nonsuited his claims. 
Damin did not file a request for amended or additional findings of fact that his request for relief in
the original answer somehow survived his nonsuit. Poulter v. Poulter, 565 S.W.2d 107, 111
(Tex.Civ.App.--Tyler 1978, no writ). Nor does he assign as error on appeal the trial court's
determination that he had abandoned his claim for affirmative relief. Having failed to do so, he has
waived the issue.

 While Monica may complain of the trial court's failure to establish Damin's parentage,
Damin may not. Inasmuch as he has no standing to appeal, we need not address the issues he raises.
Instead, we address only those issues urged by Monica.

HISTORICAL FRAMEWORK


 We recognize that the states have not uniformly treated the competing claims of biological
and psychological parents. We can even trace cultural and sociological changes in the precedent of
our own state. Certainly, progress in the reliability of genetic testing has reduced the frequency of
deniability in paternity litigation. The comfort of scientific certainty has led to the recognition of the
rights of putative fathers. A detour through a few historical cases illustrates the point.

 The "marital presumption" dates back to English common law. (4) A child born during
marriage is presumed to be the child of the husband. Under English common law, a child could not
be bastardized by proof of lack of access if the husband were present "within the four seas"
surrounding England at the time of conception, unless his impotence or sterility was established. In
the Interest of J.W.T., 872 S.W.2d 189, 191-92 (Tex 1994). Moreover, the evidentiary protocol
known as Lord Mansfield's Rule prohibited either spouse from testifying about non-access;
testimony from outsiders was required. Id., citing Goodright v. Moss, 2 Cowp. 291, 98 Eng.Rep.
1257 (1777). With the advent of the Texas Family Code nearly 200 years later, putative fathers were
granted a statutory right to voluntarily establish paternity. But it took a ruling by the United States
Supreme Court to force Texas to recognize the rights of illegitimate children to obtain child support
via involuntary paternity suits. Gomez v. Perez, 409 U.S. 535, 93 S.Ct. 872, 35 L.Ed.2d 56 (1973). 
The Legislature's reluctance to do so is best demonstrated by the successive statutes of limitation
which were imposed. See Dickson v. Simpson, 807 S.W.2d 726, 727 (Tex. 1991), referencing Act
of June 2, 1975, ch. 476, § 24, 1975 Tex.Gen.Laws 1261-62 (one-year statute of limitations); Act
of June 1, 1981, Acts 1981, ch. 674, § 2, 1981 Tex.Gen.Laws 2537 (four-year statute of
limitations); and finally, Act of May 24, 1983, ch. 744, § 1, 1983 Tex.Gen.Laws 4531 (twenty-year
statute of limitations). The Texas Supreme Court abrogated Lord Mansfield's Rule in Davis v.
Davis, 521 S.W.2d 603 (Tex. 1975). Even then, however, the marital presumption prevented a
spouse from challenging paternity of a child born during marriage. J.W.T., 872 S.W.2d at 193. 
Husbands gained that right in 1983; the same right was accorded to wives in 1987. Id. By 1989, the
phrase "illegitimate child" was banished from the Family Code, replaced by the more palatable
"child who has no presumed father." Id. at 194.

 The trend toward removing the stigma of illegitimacy was paralleled by a relaxation of social
and cultural morés. Extramarital liaisons challenged traditional notions and moral expectations of
the nuclear family. What constitutional rights did a putative father and stranger to the marriage have
to his biological child? The United States Supreme Court, in a plurality opinion, concluded that a
biological father did not have a constitutionally protected interest because "our traditions have
protected the marital family . . . against the sort of claim the [alleged father] asserts." Michael H.
v. Gerald D., 491 U.S. 110, 109 S.Ct. 2333, 2342, 105 L.Ed.2d 91 (1989). Texas courts originally
found no distinction even when the marital union had already been severed by divorce. In Jack v.
Jack, 796 S.W.2d 543 (Tex.App.--Dallas 1990, no writ), (5) a teenager [Edward] had an affair with his
stepmother [Hollis] while she was married to the teen's father [Harry]. Their clandestine liaison
resulted in the birth of a baby girl. Although Harry was the child's grandfather, he believed he was
her father, and Hollis and Edward played along. When Hollis and Harry divorced two years later,
the child was designated in the decree as a child of their marriage. Hollis and Edward, by now an
adult, married the next year and divorced four years later. Edward subsequently filed suit to establish
his paternity of the child, challenging the constitutionality of the statutes that afforded an opportunity
to rebut the marital presumption to only the husband and wife. The court of appeals rejected his
attempt to distinguish Michael H. and its recognition of the sanctity of the marital union on the basis
that Hollis and Harry had divorced and there was no longer an intact nuclear family subject to
jeopardy. Jack, 796 S.W.2d at 548-49.

 The Texas Supreme Court effectively overruled Jack in J.W.T., holding that the denial of a
putative father's standing to sue with regard to a child who has a presumed father is 
unconstitutional:

 We do not say that our Constitution guarantees every natural father ties with his
illegitimate offspring. We do say that one who is arbitrarily prevented from
attempting to establish any relationship with his natural child, after making early and
unqualified acceptance of parental duties as [the biological father] has done, is denied
due course of law under section 19 of our Texas Bill of Rights.


J.W.T., 872 S.W.2d at 198. The court concluded that "standing is constitutionally mandated" if "near
the time of the child's birth" a biological father "both 1) acknowledges responsibility for child
support or other care and maintenance, and 2) makes serious and continuous efforts to establish a
relationship with the child." Id. at 195.

 In response to J.W.T., the Legislature amended the Family Code to permit an alleged
biological father to file a parentage suit contesting another man's status as a child's presumed father.
See Tex.Fam.Code Ann. § 160.101(a)(3). Former Section 160.110(f) established the time
limitation: 

 The court shall dismiss a suit contesting a presumption of paternity filed by a man
who is not a presumed father, but who alleges himself to be the biological father of
a child, if: 


 (1) the suit is filed after the second anniversary of the later of: 


 (A) the date of birth of the child; or 


 (B) the time the presumption of paternity came into existence
after the child was born; and 

 

 (2) the presumed father: 


 (A) has resided in the same household as the child in a
father-child relationship or has established a father-child
relationship with the child through his other actions; and 


 (B) requests an order designating him as the father of the child.


The statute was designed to prevent the disruption in a child's life caused by a Johnny-come-lately
who appears on the scene after significant emotional and psychological bonding has occurred.

 Effective June 14, 2001, Texas became the first state to adopt the Uniform Parentage Act
(2000). See Sampson & Tindall, Texas Family Code Annotated, Chapter 160, Introductory
Commentary p. 789 (2003). Although the uniform act imposes a two year statute of limitations for
suits brought to adjudicate the parentage of a child with a presumed father, the Texas version
expands this window to four years. Tex.Fam.Code Ann. § 160.607. Neither the uniform act nor
the Texas statute imposes limitations for determining the parentage of a child having no presumed
father. Tex.Fam.Code Ann. § 160.606. All parties in this cause agree that the recent amendments
do not apply to Regan's paternity. We find it noteworthy to mention that the 2001 amendments
codified paternity by estoppel, allowing a court to deny a motion for genetic testing if the conduct
of the mother or the presumed father estops that party from denying parentage. Tex.Fam.Code
Ann. § 160.608. Here, however, we must address whether the prior law permits the application of
equitable estoppel in a suit to establish paternity of a child who has no presumed father.

EQUITABLE ESTOPPEL


 In her first issue for review, Monica questions whether a trial court can disregard unrebutted,
clear and convincing evidence of paternity in an original establishment action where there is no
presumed father. In essence, she contends that the equitable theory of estoppel is unavailable as a
defense in a parentage suit where biological paternity is established by genetic testing. She draws
distinctions between the instant case in which she as the mother seeks the establishment of paternity
and those cases in which estoppel barred the husband from seeking to disestablish his paternity.
Finally, she complains that the effect of the trial court's ruling was to grant adoption by estoppel and
effectively terminate Damin's parent-child relationship without the due process protections which
the state and federal constitutions afford.

 We have already noted that putative fathers gained the right to voluntarily legitimation in
1973. Former Section 13.21 of the Family Code mandated that the court enter a decree
designating the child as the legitimate child of its father if the mother consented. Tex.Fam.Code
Ann. § 13.21(b)(3)(Vernon 1986). Consent was satisfied if the mother were the petitioner. 
Tex.Fam.Code Ann. § 13.21(c). Otherwise, legitimation required a finding by the trial court that
creation of the parent-child relationship was in the best interest of the child. Id. Finding the Texas
Equal Rights Amendment to be broader than its federal counterpart, the Texas Supreme Court
concluded that the statute contained a gender-based distinction requiring men--and only men--to
satisfy the best interest test before being recognized as a parent. In the Interest of Baby McLean, 725
S.W.2d 696, 697-98 (Tex. 1987).

 Nevertheless, courts across the continent have continued to grapple with the role best interest
should play in the adjudication of biological parentage. Wyoming, for example, has consistently
held that the best interest of the child is irrelevant in an action to establish paternity. T.L. v. C.S., 975
P.2d 1065, 1068 (Wyo. 1999); In the Matter of Paternity of T.S., 917 P.2d 183, 186 (Wyo. 1996). 
Maryland has followed suit. Langston v. Riffe, 754 A.2d 389, 425 n.14 (Md.App. 2000)(the "best
interests of the child" standard generally has no place in a fact-driven original paternity action). On
the other hand, Missouri has applied the best interest standard in certain circumstances. Harmon v.
Headley, 95 S.W.3d 154, 159 (Mo.App. W.D. 2003)(the best interests of the child must be
considered where the father has first denied his paternity and years later seeks a declaration of
paternity). This is equitable estoppel in a nutshell.

 Estoppel in paternity actions is merely the legal determination that because of a person's
conduct, that person, regardless of biological status, will not be permitted to litigate parentage. It
operates both offensively and defensively. As Monica suggests, in most instances it applies to
prevent a party from disestablishing a parent-child relationship, such as an adjudicated father who
learns through genetic testing that he is not the biological father and wishes to denounce paternity
so he can discontinue paying child support. See Dowed v. Munna, 761 N.Y.S.2d 261, 261-62
(N.Y.App.Div.--New York 2003)(while the doctrine of equitable estoppel is applicable in paternity
proceedings, it generally is not available to a party seeking to disavow the allegation of parenthood
for the purpose of avoiding child support). (6) The application of estoppel in paternity actions is aimed
at "achieving fairness as between the parents by holding them, both mother and father, to their prior
conduct regarding the paternity of the child." Warfield v. Warfield, 815 A.2d 1073, 1076 (Pa.Super.
2003), quoting Fish v. Behers, 559 Pa. 523, 741 A.2d 721, 723 (1999). Estoppel is based on the
public policy that children should be secure in knowing who their parents are. If a person has acted
as the parent and bonded with the child, the child should not be required to suffer the potentially
damaging trauma that may come from being told that the father she has known all her life is not in
fact her father. Hamilton v. Hamilton, 795 A.2d 403, 405 (Pa.Super. 2002), quoting Fish, 741 A.2d
at 724. In determining whether the doctrine should be applied to a particular case, the child's best
interests are of paramount concern. Sarah S. v. James T., 299 A.D.2d 785, 751 N.Y.S.2d 61, 63
(N.Y.A.D. 3 Dept. 2002). "To that end, the 'courts are more inclined to impose equitable estoppel
to protect the status of a child in an already recognized and operative parent-child relationship.'" (7) 
Id., citing Matter of Lorie F. v. Raymond F., 239 A.D.2d 659, 660, 657 N.Y.S.2d 235 (N.Y.A.D. 3
Dept. 1997) and Matter of Kristen D. v. Stephen D., 280 A.D.2d 717, 719 N.Y.S.2d 771 (N.Y.A.D.
3 Dept. 2001).

 We find a recent decision from Wisconsin to be particularly instructive. Randy A.J. v. Norma
I.J., 259 Wis.2d 120, 655 N.W.2d 195 (Ct.App. 2002, pet. granted). A child born during the
marriage of Randy and Norma was fathered by Brendan. Between the child's birth in January 1998
and Norma's incarceration in May 1999, Norma and the child visited Brendan weekly. After Norma

went to jail, the child resided with Randy. In August 1999, Brendan filed a paternity action in
Illinois which was dismissed for lack of subject matter jurisdiction. Randy filed for divorce in
Wisconsin in September 1999and Norma filed a counterclaim in which she alleged that Brendan was
the biological father of the child. Brendan intervened in the divorce action and sought custody of
the child. The trial court concluded that Norma was equitably estopped from challenging paternity. 
655 N.W.2d at 198. The court of appeals detailed Wisconsin's equitable parent doctrine which had
previously been applied to allow a mother in a divorce action to estop a nonbiological father from
denying paternity in order to avoid child support obligations and to allow a husband/nonbiological
father to estop his wife from instituting paternity proceedings against him. Although the court
acknowledged that the equitable parent doctrine had not been invoked in Wisconsin against a natural
parent in awarding custody to a nonparent, it had been utilized against a natural parent to award
visitation to a nonparent. Id. at 202, citing J.J. v. R.J., 162 Wis.2d 420, 426-30, 469 N.W.2d 877
(Ct.App.1991). Noting that Norma and Brendan never took steps to verify paternity despite their
suspicions that Brendan was the father, that Brendan had the opportunity and ability to assume
parental responsibility for the child and chose not to do so, and that Brendan did not seek a paternity
determination until after the child was three years old, the appellate court affirmed the trial court's
determination that it was in the child's best interest to estop Norma from asserting the child's
parentage. Id. at 203-04. While the opinion paid short shrift to Brendan's intervention, it did
establish Randy as the legal, albeit not biological, father and affirmed his custody of the child. Here,
of course, Damian's intervention was voluntarily nonsuited. Because no parent-child relationship
was ever established between Damian and Regan, there is no factual basis for Monica's complaint
that his parental rights have been terminated in violation of state and federal constitutional
protections. Consequently, the only issue for our consideration is whether Judge Rucker rightly
determined that Monica was estopped from asserting Damian's parentage. On these facts, we
conclude that he did. Accordingly, we overrule Issue One.

SUFFICIENCY OF THE EVIDENCE


 In Issue Three, Monica complains that the evidence presented did not establish all of the
elements of estoppel. Monica first contends that most of the cases applying the defense of equitable
estoppel have involved a marital relationship that creates a duty to disclose information. Because
she and Kevin were never married, were not living together, and were both dating other people when
Regan was conceived, Monica claims there was no duty of disclosure. Even if we were inclined to
agree, Monica did not remain silent. Instead, she actively misrepresented that Kevin was the father
and did so repeatedly without disclosing her sexual relationship with Damian. Having spoken, she
had a duty to reveal the whole truth.

 We turn now to the sufficiency of the evidence. Equitable estoppel is based on fair dealing,
good faith and justice. In re Loomis, 587 N.W.2d 427, 430 (S.D. 1998); D.G. v. D.M.K., 1996 SD
144, 557 N.W.2d 235, 242. Equitable estoppel may arise if five factors are satisfied: (1) there was
a false representation or a concealment of material facts; (2) made with knowledge, actual or
constructive, of those facts; (3) to a party without knowledge, or the means of knowledge, of those
facts; (4) with the intention that it be acted upon; and (5) the party to whom it was made must have
relied on the misrepresentation to his prejudice. In Interest of Moragas, 972 S.W.2d 86, 89-90
(Tex.App.--Texarkana 1998, no pet.). The theory is that a person who by speech or conduct induces
another to act in a particular manner should not be permitted to adopt an inconsistent position,
attitude or course of conduct. Id. Each case must be determined upon its own facts. Id., citing
Barfield v. Howard M. Smith Co., 426 S.W.2d 834, 838 (Tex. 1968).

 Monica does not elaborate as to whether she complains of legal or factual sufficiency and her
brief addresses the subject in two short sentences without reference to the record or precedent. We
also note that she does not challenge Judge Rucker's findings that she made a false representation
or concealed material facts known to her, nor does she deny that the misrepresentation was made
with the intent that Kevin rely upon it and that he did so to his detriment. Instead, she focuses solely
on the third element, arguing that even if she owed a duty to disclose her sexual relationship with
Damin, Kevin had the means to learn the truth about Regan's paternity by requesting a paternity test. 
Monica and Damin both knew that Damin might be the biological father, yet Monica never told
Kevin of their sexual relationship. On more than one occasion, Damin confronted Monica with the
possibility that he might be the biological father, but Monica persisted in her claim that Kevin was
the father and refused Damian's request for genetic testing. Moreover, Monica repeatedly told Kevin
that he was Regan's father. She filed suit against Kevin, alleging that he was the father. She
answered his suit, admitting he was the father. By her conduct, she dissuaded both Damin and Kevin
from pursuing genetic testing which might foil her plans. She continued her deception for more than
four years after Regan was born until custody litigation loomed on the horizon. Consequently, Kevin
had no reason to question that he might not be the biological father and Monica intended as much. 
She wanted Kevin to assume the rights and duties of fatherhood because he was a more attractive
candidate than Damin. Finding the evidence sufficient, we overrule Issue Three.

PARENTAL PRESUMPTION 


 In her second issue, Monica queries whether the trial court could name a non-parent as sole
managing conservator without any evidence to rebut the parental presumption. See Tex.Fam.Code
Ann. § 153.131(a). Focusing on the trial court's findings of fact, she argues that Judge Rucker made
no finding that appointing her as managing conservator would significantly impair Regan's health
or emotional development and complains that his finding that the appointment of Kevin as sole
managing conservator would be in Regan's best interest is insufficient to overcome the parental
presumption.

 We begin with the issue of whether Kevin is a "parent." The Final Order in Suit to Establish
Parentage provides:

 IT IS ORDERED that KEVIN SHOCKLEY is, and he is declared to be, the father of
the child REGAN NICOLE SHOCKLEY, born on February 24, 1997 to MONICA
DELPHIA SMITH, and that the parent-child relationship between the father and the
child is established for all purposes.


Having upheld Judge Rucker's ruling that equitable estoppel applies and that sufficient evidence
supports his finding that Monica should be estopped from denying Kevin's parentage, Kevin is a
parent. As a parent, he may be appointed Regan's sole managing conservator provided the evidence
rebuts the presumption that it is in the best interest of the child for the parents to be appointed joint
managing conservators. See Tex.Fam.Code Ann. § 153.131(b). Because Monica has not
challenged Judge Rucker's finding that the appointment of Monica and Kevin as joint managing
conservators is not in Regan's best interest, we need not detail the evidence supporting it. We
overrule Issue Two and affirm the judgment of the trial court.



November 20, 2003 

 ANN CRAWFORD McCLURE, Justice


Before Panel No. 2

Barajas, C.J., McClure, and Chew, JJ.



1. Damin is described in the record as an unemployed itinerant pool hustler playing the "Texas Express Tour." 
 
2. Under the Uniform Parentage Act, " 'probability of paternity' means the probability, with respect to the ethnic
or racial group to which the alleged father belongs, that the alleged father is the father of the child, compared to a
random, unrelated man of the same ethnic or racial group, expressed as a percentage incorporating the paternity index
and a prior probability." Tex. Fam.Code Ann. § 160.102(14)(Vernon 2002). See Acts 2001, 77th Leg., R.S., ch. 821,
§ 1.01, 2001 Tex.Gen.Laws 1610, eff. June 14, 2001. Suits pending on the effective date of the statute continue to be
governed by the prior law, which did not specifically define "probability of paternity."
3. Kevin's motion alleged that he was a presumed father under the provisions of the Family Code in existence
at the time of Regan's birth. See former Tex.Fam.Code Ann. § 151.002 (Vernon 1996). Former Section 160.110
required that the court dismiss a suit contesting a presumption of paternity filed by a man who was not a presumed father
but who alleged himself to be the biological father if the suit were filed after the second anniversary of the child's birth
and the presumed father resided in the same household as the child in a father-child relationship or established a father-child relationship with the child. See former Tex.Fam.Code Ann. § 160.110 (Vernon 1996). While Kevin was a
presumed father at the time Regan was born, he no longer enjoyed that status at the time suit was filed due to subsequent
legislative amendments. See Tex.Fam.Code Ann. § 160.204 (limiting the presumptions of paternity to those related to
marriage). The statute was recently amended again to reinsert the "holding out" presumption, subject to an express
requirement that the man reside "continuously" with the child during the first two years of the child's life. See Acts 2003,
78th Leg., R.S., ch. 1248, § 1, 2003 Tex.Gen.Laws 3537, eff. Sept. 1, 2003; Sampson & Tindall, Texas Family Code
Annotated § 160.204 Commissioners' Comment to UPA Section 204, p. 800 (2003). We offer no opinion as to
whether Kevin would qualify as having continuously resided with Regan for the requisite two-year period inasmuch as
the statutory amendment applies only to suits affecting the parent-child relationship filed on or after the effective date
of the Act. Acts 2003, 78th Leg., R.S., ch. 1248, § 6, 2003 Tex.Gen.Laws 3538, eff. Sept. 1, 2003. In any event, rather
than challenge Kevin's presumption of paternity, Damin opted to nonsuit his intervention, filing it a mere ten days after
the motion for summary judgment was filed.
4. "Common law" has been well described by the Texas Supreme Court:


 The common law of England was conformable to 'the law of Nature, the law of God, to common
sense, to legal reason, justice, and humanity.' Broom, Commentaries on the Common Law, p. 21, (4th
ed. 1869). Calvin's Case, 7 Co. 1a, 77, Eng.Rept. 377, 391 et seq. (K.B.1608); Forbes v. Cochrane,
107 Eng.Rep. 450, 455, 458 et seq. (K.B.1824). Lord Mansfield proclaimed the basis of this very rule
to be 'decency, morality and policy.' The system and tradition that we call the 'common law' is not
a body of law which evolved within historic England or a bygone age to stand immutable ever
afterward. It is the guide and governance of this Court today--in the absence of a mandate of the
Constitution or statute. Learned Hand said that our common law is 'a combination of custom and its
successive adaptations. The judges receive it and profess to treat it as authoritative, while they gently
mould it the better to fit changed ideas.' THE SPIRIT OF LIBERTY p. 52 (1952). 'This flexibility
and capacity for growth and adaptation is the peculiar boast and excellence of the common law.'
Hurtado v. California, 110 U.S. 516, 530, 4 S.Ct. 111, 118, 28 L.Ed. 232 (1884). '(A)s life is always
in flux, so the common law, which is merely life's explanation as the lawyer and the judge, law's
spokemen, are always making it, must also be.' Hutcheson, The Common Law of the Constitution,
15 Tex.L.Rev. 317, 319 (1937).


Davis v. Davis, 521 S.W.2d 603, 607-08 (Tex. 1975).
5. In candor, the author notes that she served as appellate counsel for the appellant in that case.
6. The issue of paternity disestablishment based on genetic testing has generated a great deal of national
controversy. More than twelve states have enacted legislation permitting disestablishment while others prevent it through
application of res judicata, laches, and estoppel. See generally John J. Sampson, Paternity Disestablishment in Texas: 
and the Current Controversy in the United States, in 2 State Bar of Texas Annual Advanced Family Law Course,
Ch. 52 (2002).
7. It is this theory that underlies new Section 160.608 which authorizes a trial court to deny a motion for genetic
testing of a child with a presumed father if the court finds by clear and convincing evidence that the conduct of the
mother or the presumed father estops that party from denying parentage and it would be inequitable to disprove the
father-child relationship. This determination requires the court to consider the best interest of the child and nine
enumerated factors, including the length of time during which the presumed father has assumed the role of father. See
Tex.Fam.Code Ann. § 160.608.